**DATA PROBE ACQUISITION CORP., and Data Probe, Inc., Plaintiffs,**

v.

**DATATAB, INC., Sanford C. Adams, Lee D. Gallaher, John L. Lobel, CRC Information Systems, Inc., and CRC Acquisition Corp., Defendants.**

No. 83–Civ. 5272.

United States District Court, S.D. New York.

Aug. 16, 1983.

Kass, Goodkind, Wechsler & Labaton, New York City, for plaintiffs; Stuart D. Wechsler, Joel Feffer, Lawrence A. Sucharow, John Riley, New York City, of counsel.

Putney, Twombly, Hall & Hirson, New York City, for defendants; Allen E. Burgoyne, Francis E. Lake, Jr., New York City, of counsel.

SOFAER, District Judge:

Plaintiffs Data Probe Acquisition Corp., and its parent Data Probe, Inc., (collectively "Data Probe"), brought this action under the Williams Act, 15 U.S.C. §§ 78m(d), (e) and 78n(d)–(f) (1976), to enjoin a corporate merger between defendant corporations, Datatab, Inc. and CRC Acquisition Corp., a wholly-owned subsidiary of CRC Information Systems, Inc. ("CRC"), because defendants allegedly entered into unlawful option and indemnity agreements. Plaintiffs also

claim that a letter written by Datatab to its shareholders on July 1, 1983 failed to satisfy the disclosure requirements of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) and Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e), which amended the 1934 Act, and violated Rules 14e–2, 17 C.F.R. § 240.14e–2, and 14a–9, 17 C.F.R. § 240.14a–9. All three parties, Data Probe, Datatab and CRC, are engaged in the market research business. The complaint raises no state law claims, although it alleges at various points breaches of "fiduciary" duties by Datatab's officers and directors. See Complaint ¶¶ 22, 23, 26. For the reasons that follow, plaintiffs' request for injunctive relief is granted, both because the July 1 letter omits material facts and because the option agreement is a manipulative device that interferes unlawfully with plaintiff's tender offers, in violation of Section 14(e).

## I.

This matter was brought on by Order to Show Cause before the undersigned in the emergency part for the Southern District of New York. The parties agreed that no discovery was necessary, and established an expedited schedule for briefing and argument. At oral argument on July 27 the parties conceded that the only disputed issues of fact in the litigation concerned statements allegedly made at a dinner meeting between the principal officers of Datatab and Data Probe. The parties agreed to proceed with a trial of those disputed issues, and thereafter to submit this case for judgment on the papers presented, conceding on the record that no further oral testimony or written exhibits would be necessary for a final disposition. These stipulations moot the pending motions for a preliminary injunction and for summary judgment and permit the court to enter final judgment. A tentative, expedited opinion was filed on August 4 to permit prompt appeal; this revised opinion represents the court's final findings and conclusions.

## II.

Datatab, a company with a recent history of losses, approached CRC in December 1982 to inquire whether CRC would be interested in acquiring the financially troubled corporation. Datatab is traded over the counter, and at the time had a book value of $2 per share and a net operating loss tax carry forward on December 31, 1982 in excess of $1,250,000. CRC is a privately held corporation having four director-shareholders, three of whom were formerly employed by Datatab. Negotiations followed, and on April 29, 1983 the companies entered into a proposed "merger" agreement under which CRC would create a subsidiary corporation, CRC Acquisition Corp., which would purchase all outstanding Datatab common stock for $1.00 per share and then merge into Datatab making Datatab a wholly-owned subsidiary of CRC. Pursuant to federal and state laws, on May 26, 1983 Datatab sent proxy materials to its shareholders providing information explaining the proposed sale of Datatab stock by "merger" and announcing a June 23 special meeting of shareholders to vote on the proposed sale. In these materials, Datatab's board of directors described CRC and stated that in its opinion, supported by the views of various purported experts, $1.00 was a fair price for each share of Datatab stock. In addition, these materials disclosed that, if the sale-by-merger plan were adopted, Datatab's principal officers, currently on month to month contracts, would receive three-year employment contracts with CRC which altered their salaries with Datatab as follows: Mr. Sanford Adams, President and board member at Datatab, would receive an increase in annual salary from $94,500 to $100,000, with a guaranteed bonus of at least $5,000 per year; Mr. Lee D. Gallaher, a member of Datatab's board of directors, would receive a reduction in salary from $80,000 to $70,000; and Mr. John L. Lobel, Vice-President, Treasurer and board member at Datatab, would receive an increase from $69,800 to $70,000.

On June 21, Data Probe, a relatively small but profitable company in a related

line of market research activity, made a cash tender offer of $1.25 for all outstanding common stock of Datatab, conditioned on the rejection by Datatab shareholders of the proposed sale-by-merger agreement at $1.00 per share. Data Probe published all the information required by the Williams Act in connection with its tender offer, explaining its purposes, the source of its financing, and its intentions for the company. Datatab's management thereupon adjourned the scheduled June 23 meeting to July 12 and subsequently to August 8, and informed CRC management of Data Probe's tender offer. Datatab claims that, after considerable negotiation, CRC agreed to raise its offer to purchase through a merger all outstanding shares of Datatab stock from $1.00 to $1.40 per share, but only if Datatab management first granted CRC an irrevocable option, not subject to shareholder review and exercisable on demand for one year, whereby CRC could purchase 1,407,674 voting shares of Datatab authorized but unissued stock—an amount equal to 200% of all presently outstanding voting shares—at the same price of $1.40 per share.

Meanwhile, negotiations also occurred between the principals of Datatab and Data Probe. At the mini-trial held to resolve the only disputed issues of fact in this case, the evidence established that Yitzhak Bachana, President of Data Probe, called Sanford Adams of Datatab and arranged to meet and discuss Data Probe's interest in the company. They met on June 21, at a restaurant in New York City, and discussed a variety of issues, including Data Probe's intentions with respect to the continuation of the services and salaries of Datatab's officers. The versions of the dinner conversation offered by the parties were similar in most respects. Both Bachana and Adams agreed that the salary of the Datatab officers was discussed, and Adams conceded that he asked Bachana what salary arrangements Bachana was willing to offer. He testified that Bachana indicated a probable willingness to go along with the annual salary amounts to which CRC had agreed, and Adams suggested in his testimony that Bachana did not view a three-year commit-

ment as unacceptable. In this latter respect, however, Adams' own notes undermine his testimony and support Bachana's claim that Bachana was unwilling to commit himself. The notes read at the relevant point: "will discuss—premature." (D.Ex. 1). This effort by Adams to indicate that length of contract was not a problem, as well as his demeanor and that of Bachana, make it clear that the length-of-contract issue was in fact of major concern to Adams, and that, while Bachana might have been willing to go along with the salary amount agreed to by CRC, he was unwilling to commit Data Probe to either the amount or duration of the proposed employment contracts until he had examined the situation and satisfied himself that the salary arrangements (totalling $250,000 annually) were justified by the company's earnings. This explains why Adams stated to Bachana, as alleged in Bachana's affidavit: "This baby will never work for a dollar less." Affidavit, July 21, 1983, ¶ 4. Adams denies having made the quoted statement, but his subsequent arrangement with CRC—which seeks to vest CRC with the power to override the Datatab shareholders—indicates that he did respond in substance to Bachana when reminded of the need for shareholder approval: "I don't care about shareholders; we have to take care of ourselves and this baby is not going to work for a dollar less."

By July 1, Datatab management had agreed to accept CRC's commitment to offer to purchase Datatab's shares by merger at $1.40, and had granted in exchange for that commitment an irrevocable option that in effect guaranteed CRC the power to accomplish the proposed merger even if disapproved by Datatab's present shareholders. On that day, Datatab sent its shareholders a letter informing them of a new proposed "merger" agreement with CRC by which, if approved, CRC would pay $1.40 per share for all outstanding shares of Datatab stock. It also stated that Datatab had granted CRC an option to purchase 1,407,674 authorized but unissued shares at the $1.40 price. Finally, the letter notified shareholders that a meeting was scheduled in August to permit shareholders to vote on

the amended "merger agreement," and that the shareholders would receive timely supplemental proxy materials relating to that meeting. The shareholders were not expressly informed, however, that if the option agreement was valid a vote rejecting the "merger" would have been inconsequential, since the option would give CRC the power to buy the number of shares necessary to approve an identical merger proposal at a subsequent meeting; nor were they advised that the option agreement, if valid, effectively capped any further bidding for their shares.

On July 14, Data Probe made a second tender offer for all outstanding Datatab shares, increasing its bid to $1.55; the offer was conditioned of course upon the invalidation by corporate or judicial action of the option agreement between Datatab and CRC. Simultaneously, Data Probe commenced this action, claiming that defendants, as principals or aiders and abettors, violated Section 14(e) of the Exchange Act by entering into the lockup agreement, which constitutes a manipulative act or practice in connection with the tender offer for shares of Datatab, Complaint ¶ 28. Data Probe further claimed that defendants violated Section 14(e)'s disclosure requirements by failing to disclose in its July 1, 1983 letter to Datatab shareholders that:

(a) the purposes of the Lockup Agreement are to preclude Data Probe from successfully bidding for Datatab shares, deter a competitive offer from any third-party, insure the success of the CRC merger proposal, and perpetuate Datatab's management in office at the expense of Datatab's shareholders;

(b) the Lockup Agreement set an artificial ceiling of $1.40 per share on the price any bidder would offer, and consequently on what shareholders could expect to receive, for Datatab's shares;

(c) no inquiry was made by Datatab to determine whether CRC had the funds to purchase Datatab's shares pursuant to the Lockup Agreement;

(d) by exercising the option CRC would control two-thirds of the voting shares of Datatab which would disenfranchise the shareholders of Datatab by making their vote on the Amended Merger Agreement meaningless;

(e) [an] Indemnification Agreement [existed between Datatab and CRC holding the former harmless for its acceptance of the option proposal;] and

(f) the Securities and Exchange Commission ("SEC") considers similar indemnification agreements to violate public policy.

Id. ¶ 29.

### III.

■ This case presents the important question whether the Williams Act permits the management of a target company unilaterally to thwart an ongoing tender offer by granting to one contestant an option that effectively precludes further bids. Counsel for target companies in tender offer cases like to put the question differently. In some of the commentary recently produced in response to the Sixth Circuit's decision in *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir.1981), the issue has been described as whether the Williams Act is anything more than a disclosure statute. All concede that those provisions of the Act that require disclosure of information by the participants in the tender offer process confer jurisdiction on the federal courts to enforce their compliance. But many contend that the enforcement jurisdiction conferred upon the federal courts by Section 14(e), which proscribes "fraudulent, deceptive and manipulative acts and practices . . . in connection with a tender offer," does not extend to tactics which fall short of fraud or classic market manipulation. The language of Section 14(e), it is argued, is virtually identical to that of Section 10(b) of the Securities Exchange Act of 1934, which the Supreme Court in *Santa Fe Industries v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), construed as conferring jurisdiction to review whether the defendant had engaged in blatantly fraudulent

practices or market manipulations, but did not provide a federal law basis for claims stemming from management's abuse of fiduciary duties. *Santa Fe* held that stockholders who complained of the unfairness of a short form merger must pursue their remedies in state not federal court and that if, in fact, management's action deprived stockholders of any part of the full and fair market value of their shares, those values could only be obtained in state court appraisal proceedings. Defendants here, and others who criticize *Marathon,* claim that construing the words used in the Williams Act proscribing "manipulative" practices literally would involve federal courts in reviewing whether defendants had violated fiduciary duties, and for the same reasons relied on by the Court in *Santa Fe* contend that such claims must be resolved in state court proceedings. They find further support for this position in the holding in *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), which describes the Williams Act as concerned with assuring disclosures of information for the protection of shareholders and holds that no cause of action for damages exists in federal court for competitors in tender-offer battles.[1] They argue that decisions such as *Applied Digital Systems, Inc. v. Milgo,* 425 F.Supp. 1145 (S.D.N.Y.1977) assuming jurisdiction in Williams Act cases challenging defensive tactics, preceded the Supreme Court's decision in *Santa Fe* and are no longer good law.

The notion that *Santa Fe* is dispositive rests on the mistaken assumption that analysis of Section 10(b) of the 1934 Act applies with equal force to the Williams Act. Section 10(b) is directed at insuring informed investment decision through "regulating trading markets, requiring disclosure, and prohibiting deception and classic kinds of market manipulations." Weiss, *Defensive Responses to Tender Offers and the Williams Act's Prohibition Against Manipulation,* 35 Vand.L.Rev. 1087, 1092 (1982). The Williams Act focuses on the narrower and more specific problem of "protection of investors who are confronted by a cash tender offer. *Chris-Craft,* 430 U.S. at 35, 97 S.Ct. at 946. A different form of protection is necessary under the Williams Act than under the 1934 Act, because tender offer battles, even in a context of full disclosure, create extreme pressures and may involve tactics which distort or even abort the investment decision. Furthermore, whereas available state-court remedies might be sufficient to warrant refusing to recognize a federal claim for "unfairness" under Section 10(b), a federal, injunctive remedy is a necessary adjunct to the Williams Act goal of preventing abuses of the tender offer procedure *before* they damage shareholders by undermining or aborting the tender offer process. As Senator Williams said in describing the purposes of the Act:

> If the stockholder sells and can establish at a later time that he fell victim to fraud or misstatements, he would obviously have recourse to the courts. But many

[1]. Defendants assert that Data Probe lacks standing under Section 14(e) to challenge the defensive tactics employed by Datatab and CRC, after the Supreme Court holding in *Piper v. Chris-Craft Industries, Inc.,* 430 US 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). Allowing a tender offeror to maintain a suit for injunctive relief, however, is consistent with *Chris-Craft* and with subsequent federal case law and, in fact, provides an essential tool for achieving the objectives of the Williams Act. The Court in *Chris-Craft* declined to determine whether a suit for injunctive relief would lie under Section 14(e), confining itself to the narrow question of an implied cause of action for damages. 430 U.S. at 47 n. 33, 97 S.Ct. at 952 n. 33. In addition, the Court expressly stated that "in corporate control contests the stage of prelimi-nary injunctive relief, rather than post contest lawsuits, 'is the time when relief can best be given.'" *Id.* at 42, 97 S.Ct. at 949. The tender offeror may be the only party with enough knowledge and awareness to identify nondisclosure or manipulative practices in time to obtain a preliminary injunction, which may be the only means of preserving the unimpeded choice of shareholders the Williams Act was designed to protect. *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366, 371 (6th Cir.1981); *Humana, Inc. v. American Medicorp, Inc.,* 445 F.Supp. 613, 615–616 (S.D.N.Y.1977); *Crane Co. v. Harsco Corp.,* 511 F.Supp. 294, 300 (D.Del.1981). *See also Applied Digital Data System's Inc. v. Milgo Electronic Corp.,* 425 F.Supp. 1145, 1152 (S.D.N.Y.1977).

stockholders are unwilling to go to court even though they believe they have a sound case. Litigation is expensive, time consuming, and lacks the advantages that result from advance filing of the facts for the public record.

113 Cong.Rec. 854 (daily Jan. 18, 1967) (Statement of Senator Williams). Finally, the Supreme Court has shown in *Edgar v. Mite Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), that standards do exist for determining when the Williams Act's protection of the tender offer process preempts state corporation law; by contrast, one of the considerations that led the Court in *Santa Fe* to refuse federal jurisdiction was the lack of federal standards by which to evaluate whether state fiduciary laws should be preempted. 430 U.S. at 478, 97 S.Ct. at 1303.

█ The view of the Williams Act as purely a disclosure law, conferring little other protection on shareholders or contestants in the market for corporate control, is in addition inconsistent with the Act's history and purposes, and with authoritative judicial constructions. State law principles, including those of fiduciary duty and appraisal value, are not directly related to the purposes of the Williams Act. The Williams Act was not written to insure that corporate managers perform their general duties faithfully, or that shareholders succeed in obtaining the full and fair value of their stocks in tender-offer sales. Rather, the Act was written to assure stockholders access to the information necessary to make informed judgments, which they would then in fact be allowed to exercise, however positive or detrimental the economic consequences. Congress therefore imposed in the Act not one, but two duties on tender-offer participants, including target corporations: first, to provide shareholders the required information; and second, to refrain from any conduct that unduly impedes the shareholders' exercise of the decision-making prerogative guaranteed to them by Congress.

A. *Dual Purposes of the Williams Act*

█ In *Piper v. Chris-Craft Industries Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), the Supreme Court reviewed much of the legislative history of the Williams Act, and demonstrated that its primary purpose was to provide for disclosure of information to shareholders. *Chris-Craft* dealt comprehensively, however, only with those portions of the Act's history necessary to explain its holding that the Williams Act provides no remedy to contestants for damages caused by its violation. While the Supreme Court has never passed upon the extent to which the Williams Act was intended to prevent defensive tactics by target companies, its recent decision in *Edgar v. Mite Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), reveals that important aspects of the legislative history of the Williams Act had not been fully examined in *Chris-Craft,* including, for example, Congress' recognition of the importance of preventing target companies from delaying the tender offer process. *See discussion infra.*

A review of the Act's legislative history with the legitimacy of defensive tactics in mind reveals that Congress indeed meant for the federal courts to prevent tender offer participants from interfering with the informed investor choice that the Act sought to assure. One can safely say that the Act underwent from its original introduction in 1965 to its ultimate passage in 1968 a steady transformation from legislation designed to prevent corporate takeovers by cash tenders, to a bill that studiously maintained neutrality between offerors and targets, but consciously protected the rights of shareholders to transfer managerial power by tendering their shares, with proper information and without undue interference.

Senator Williams' original bill was avowedly designed to protect "proud old companies" from "white collar pirates" who seized assets with funds from unknown sources and "split the loot." *See* 111 Cong. Rec. 5273 (Oct. 22, 1965) (statement of Sen. Williams). Broad disclosures by would-be offerors would have been required, and ample time for defensive measures would have been provided by a 20-day precommencement filing requirement, with SEC regula-

tion of corporate defenses limited to purchases of substantial blocks of a company's own stock. *See* S. 2731, 89th Cong., 1st Sess. 28257–60 (1965). This bill was not considered when initially introduced, and as revised on reintroduction it increased the mechanisms for shareholder participation in the tender offer process and reduced the delay from filing to purchase from 20 to 5 days. *See* Cohen, *A Note on Takeover Bids and Corporate Purchases of Stock,* 2 Bus.Law 149 (1966). Continued hearings and discussion led to balanced disclosure provisions that comported with SEC Chairman Manuel Cohen's clear espousal of the bill's neutrality of purpose: "It is not intended to encourage or discourage such activity [acquisitions of control] or provide management or any other group with special privileges over any other." *See Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids, Hearings on S. 510 Before Subcomm. on Securities of Banking and Currency Committee,* 90th Cong. 1st Sess. 16 (1967) (hereinafter "Senate Hearings"). Rather, the bill—which by then expressly applied to a corporation's repurchases of its stock—was repeatedly touted as a vehicle for permitting informed investment decisions. And in this connection, Chairman Cohen made explicit the obvious proposition that an effort to enable a stockholder to exercise an informed judgment necessarily implies the exercise of a judgment that is not unreasonably restricted by offers with unfair conditions on acceptance, or by management's misleading or manipulative efforts to prevent acceptance:

It would be naive to assume that tender offers are not, at times, opposed by management motivated by their own interests in staving off a change in control. It would, however, be as much an overstatement to suggest that management, in opposing bids is motivated solely by self interest as it would be to suggest that takeover bids are always improper or dangerous to the interests of investors.

It may be of interest to note that attempts to discourage shareholders from accepting tender offers take a variety of forms. Recently, in order to block a takeover bid, the management of one company hurriedly called a stockholder's meeting to obtain authorization to make a competing offer to buy its own shares at a higher price. In another situation, after a tender offer was announced, management proposed a stock split and shareholders were led to believe, contrary to fact, that the approval of the stock split was an alternate to accepting the tender offer.

Senate Hearings at 19. Indeed, Commissioner Cohen specifically anticipated that new devices for manipulation would be developed, and requested that the Commission be given authority to regulate them:

[T]here is involved a form of industrial warfare in which stakes are high, and two or more groups are attempting to manipulate the public security holders to their own advantage... As in most other areas entrusted to it, the Commission's responsibility should be limited to requiring appropriate disclosure, to guarding against deceptive and unfair devices designed to coerce or prevent action, and it should be provided with adequate tools to deal effectively with the various techniques that have been developed, and are continuing to be devised to seek or prevent takeover bids and other matters dealt with in the bill. Finally adequate authority must be accorded to deal with the violations of these precepts—all designed to give the investor the fairest possible opportunity to make his own investment decisions.

*Takeover Bids: Bills Providing for Full Disclosure of Corporate Equity, Hearings on H.R. 14475, S.510 Before the Committee on Interstate and Foreign Commerce,* 90th Cong.2d Sess. 11 (1968) (hereinafter "House Hearings").

The themes of stockholder protection and increased opportunity for successful bids were made even stronger when the bill reached the Senate. Preliminary filing of offers with the SEC was eliminated, for example, despite lobbying for predisclosure. *See* House Hearings at 17; Senate Hearings at 20. When Senator Williams spoke in favor of the legislation, he stressed its

neutrality, and its intent to protect the interests of all participants "without impeding cash takeover bids." 113 Cong.Rec. 854 (Jan. 18, 1967). And Senator Javits, another supporter, stressed that the bill would enable stockholders to benefit from "the opportunities which result from the competitive bidding for a block of stock of a given company." 113 Cong.Rec. 24666 (Aug. 30, 1967). The legislation as adopted concerned not only the provision of information, but the guaranty of a fair opportunity to use it.[2]

Chairman Cohen and various participants at several points in the legislative process no doubt recognized that the tender offer is the only form of corporate acquisition that is solely within the power of shareholders to approve. While a proxy battle may also be a meaningful weapon for changing a company's management or control, shareholders have no means other than the tender offer by which to exercise their rights of ownership to displace incumbent management entirely independently of a company's board of directors. The threat of displacement is an important constraint on management self-dealing, and is felt to enhance efficiency and productivity. *See, e.g.,* Easterbrook & Fischel, *The Proper Role of a Target's Management in Responding to a Tender Offer,* 94 Harv.L.Rev. 1161, 1168–74 (1981); Fischel, *Efficient Capital Market Theory,*

*the Market for Corporate Control, and the Regulation of Cash Tender Offers,* 57 Tex. L.Rev. 1, 5–7 (1978); Gilson, *A Structural Approach to Corporations: The Case Against Defensive Tactics in Tender Offers,* 33 Stan.L.Rev. 819, 819, 841–45 (1981); Note, *Golden Parachute Agreements: Cushioning Executive Bailouts in the Wake of a Tender Offer,* 57 St. John's L.Rev. 516, 541–42 (1983); Manne, *Mergers and the Market for Corporate Control,* 78 J.Pol. Econ. 110, 117–18 (1965). Congress' decision therefore to preserve and strengthen the tender offer as a viable means for shareholders to circumvent management and opt for a change of control is a matter of great social and economic significance. It should not turn upon a mechanical construction of words such as "manipulation" that ignores their specific and special context.[3] Merely requiring disclosure of material facts does not assure shareholders a fair opportunity actually to tender their shares. To achieve the Act's objectives most effectively, it should be construed to require that shareholders also be protected from those devices that unduly interfere with informed tenders.

The nature of the regulations promulgated or proposed by the SEC for enactment under Section 14(e) is another indication that "fraudulent, deceptive and manipula-

**2.** Senator Williams, presenting the final version of his bill to the Senate, explained the House amendment empowering the SEC to define and regulate fraudulent, deceptive, and manipulative acts and practices in terms of the legislative assumption that the phrase, even though virtually identical to language employed elsewhere in the Securities Exchange Act of 1934, would take on new significance in this context:

The revised standard is based on comparable language in section 15(c)(2) of the act, and should give the Commission adequate power to prescribe comprehensive rules and regulations to deal with the abuses arising in this area, just as its powers under section 15(c)(2) have enabled it to do with respect to the activities specified in that section.

113 Cong.Rec. 21954, July 17, 1968.

**3.** The Senate Report states that "S. 510 would amend the Securities Exchange Act of 1934 by requiring disclosure of pertinent information and would afford other protections to stockholders" in tender offers or when corporations repurchase their own securities. S.Rep. No.

550, 90th Cong., 1st Sess. 1 (1967). These "other protections" ensure substantive fairness and a climate conducive to reasoned investment decisions by shareholders of a target company. Thus, the pro rata provisions of Section 14(d)(6) were designed to allow "shareholders a fair opportunity to participate in the offer." *Id.* at 10 (1967). The best price provision of 14(d)(7) assures "equality of treatment among all shareholders who tender their shares." *Id.* The timing provisions of the rules promulgated under Section 14(e) were enacted to prevent shareholders from being either surprised or stampeded into premature decisions. Disclosure is far from the only technique by which the Williams Act sought to protect shareholders' freedom of choice. But *see* Schneiderman *New Tender Techniques Key Legislative Concern,* 189 N.Y.L.J. 25 (1983) (Reviewing the legislative history from the same perspective as this opinion but reaching a different conclusion.)

tive acts and practices" are not limited to the narrow confines suggested by the view that those words refer only to devices designed to defraud or misleadingly to manipulate prices. These regulations show that fraudulent, deceptive, or manipulative acts may include strategies that unduly pressure the stockholder or impede the tender offer process. Under its regulatory power to interpret Section 14(e)'s prohibitions the SEC has, for example, deemed the use of inside information to be a "fraudulent, deceptive or manipulative practice" in 17 C.F.R. § 240.-14e–3; it has imposed timing restrictions on when an offer may be withdrawn and on the legality of unannounced increases in the offering prices or extensions of the offering period in 17 C.F.R. § 240.14e–1; and it has required target companies to take public positions on the tender offer in 17 C.F.R. § 14e–2a. Particularly instructive is the 240 C.F.R. § 14e–1(a) provision on timing. It insures that the shareholder be given a predictable, adequate time period to make an intelligent investment decision, without being stampeded by the fear that the offer will be suddenly withdrawn. In addition, the SEC has proposed that failure by the subject company to provide a shareholder list on demand "would constitute a fraudulent, deceptive and manipulative act or practice under Section 14(e)." Fed.Sec.L. Rep. (CCH) ¶ 80,659 (1976). Like the rule on timing, this rule would tend to assure that the proper functioning of the tender offer process will not be unduly obstructed.

The SEC therefore has used its power to define and prevent manipulative acts expressly conferred by Section 14(e), to include among them undue pressures or obstructions on shareholder autonomy. This construction must be given proper weight. As the Supreme Court has repeatedly emphasized, "[w]hen faced with a problem of statutory construction, [the] Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964). *See also SEC v. Talley Industries, Inc.,* 399 F.2d 396, 403 (2d Cir. 1968), *cert. denied,* 393 U.S. 1015, 89 S.Ct. 615, 21 L.Ed.2d 560 (1969). The SEC has

gone beyond assuring proper disclosure and beyond preventing outright fraud and price manipulation; it has assumed that under Section 14(e) of the Williams Act target companies may be required to refrain from actively and unduly obstructing shareholders, and also may sometimes be required to act affirmatively to promote the opponent's cause.

**B.** *Judicial Regulation of Tender Offers*

The federal courts have enforced aspects of the Williams Act from its inception. Access to the federal courts has never been denied to enforce all the Act's express informational requirements, or the regulations passed pursuant to congressional authority. But federal decisions both before and after the *Marathon* case make clear that federal authority to enforce the Act goes beyond its disclosure objectives. Federal jurisdiction and responsibility for enforcing the Williams Act matches precisely, as it should, the legislation's dual objectives of assuring both an informed decision and a meaningful opportunity to decide.

The proper starting point for analysis here, as in so many other difficult areas of federal jurisdiction, is a decision by Judge Edward Weinfeld, *Applied Digital Data Systems, Inc. v. Milgo Electronics Corp.,* 425 F.Supp. 1145 (S.D.N.Y.1977). That Williams Act case no doubt turns primarily upon Milgo's failure to comply with the Act's disclosure requirements in connection with its sale of 15.5% of its unissued common stock to Racal Electronics, Ltd. to avoid a threatened tender offer by plaintiff. But Judge Weinfeld was also troubled by the fact that Milgo's defensive "lock-out," while within the range of sales permitted by the New York Stock Exchange without shareholder approval, had an especially damaging effect on plaintiff's tender offer plans. The sale effectively deprived plaintiff of tax advantages that may have made its tender offer particularly attractive to Milgo shareholders. *See id.* at 1158. Judge Weinfeld issued an injunction against the "lock-out," and he described with character-

istic clarity the manner in which Section 14(e) must be construed:

> A proper evaluation of whether a claim is stated under a provision of the securities laws cannot, however, be based solely upon the bare language of the statute at issue, but must take into consideration both the meaning of that language within the particular context in which it occurs and the propensity of a given construction of the provision to effectuate the remedial purposes of the securities acts.

*Id.* at 1153 (footnotes omitted).

These principles of statutory construction explain the Sixth Circuit's decision in *Marathon.* While Section 14(e) uses the same word—"manipulation"—as does Section 10(b), it does so in a wholly different context. Judge Engel described this at length, and with a force of logic that remains untarnished by recent criticisms:

> The term "manipulative" is not defined in either the Securities Exchange Act or the Williams Act. *See, e.g.,* 15 U.S.C. § 78c. "Manipulation" in securities markets can take many forms, *see, e.g.,* 15 U.S.C. §§ 78i, 78j (proscribing certain forms of manipulation), but the Supreme Court has recently indicated that manipulation is an affecting of the market for, or price of, securities by *artificial* means, i.e., means unrelated to the natural forces of supply and demand.
>
> "Use of the word 'manipulative' is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976) (footnote omitted).
>
> " 'Manipulation' is 'virtually a term of art when used in connection with securities markets.' *Ernst & Ernst,* 425 U.S., at 199 [96 S.Ct. at 1384]. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."
>
> *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). In our view, it is difficult to conceive of a more effective and manipulative device than the "lock-up" options employed here, options which not only artificially affect, but for all practical purposes completely block, normal healthy market activity and, in fact, could be construed as expressly designed solely for that purpose.

The types of options demanded and received by USS in this case are relatively new to the world of tender offer takeover contests, and we are unaware of any Supreme Court or Court of Appeals case confronting the question of whether these particular techniques are "manipulative" within the meaning of section 14(e) of the Williams Act. However, courts have recognized that the term "manipulative" must remain flexible in the face of new techniques which artificially affect securities markets. "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." *Santa Fe Industries, Inc. v. Green,* supra, 430 U.S. at 477, 97 S.Ct. at 1302 (Section 10(b)). A similar observation was made regarding the Commodity Exchange Act, 7 U.S.C. §§ 9, 13, which prohibits manipulation of commodities market prices:

> "The methods and techniques of manipulation are limited only by the ingenuity of man. The aim must be therefore to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand." *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1163 (8th Cir. 1971), *cert. denied,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972).

669 F.2d at 374. Just as Chairman Cohen of the SEC predicted when the Williams Act was under consideration, participants in the tender offer process have developed new techniques for preventing or limiting the fair exercise of stockholder decision-making power. The law should be construed with a flexibility sufficient to interdict those new devices that are inconsistent with the Act's ultimate objectives.

Judge Engel recognized, however, the need for flexibility, apparently in order to avoid prohibiting defensive measures that are consistent with the Act's objectives, even though they might technically fit the definition he adopted in *Marathon* of "manipulation":

> In conclusion, it is apparent to us that the particular options granted to USS by Marathon under the circumstances of this tender offer contest constitute "manipulative acts" in connection with the tender offer, violative of section 14(e) of the Williams Act. In so ruling, we do not purport to define a rule of decision for all claims of manipulation under the Williams Act, or indeed for all forms of options which might be claimed to "lockup" takeover battles or otherwise discourage competing tender offers. We leave these issues to developing law in this new and difficult area of securities regulation.

669 F.2d at 377.

The securities bar, and some federal judges, have nevertheless responded to *Marathon* as though it suggests an end to virtually any possibly lawful use of an option or other defensive technique in a tender offer contest. Perhaps these reactions could have been muted if the ruling had not been based on the suggestion that the statute automatically makes "manipulative," and therefore presumably unlawful, any action that affects the market in connection with tender offers by artificial means. The consternation of the bar is readily understood when one considers that, unlike fraudulent, deceptive, or manipulative devices in other areas of securities law, virtually every defensive action by an offeror or a target company, or their lawyers, in connection with a tender offer, could conceivably satisfy the broad test of "manipulative" conduct suggested in *Marathon.* Given the widespread assumption that these devices may be lawfully used so long as they do not unduly interfere with the tender offer process, one can appreciate the suggestion, for example, that an attack on the option tactic "should not be forced into the Procrustean mold of 'manipulation' under the antifraud provisions of the Williams Act." Bialkin, *Court Casts Cloud over Op-*

*tion Tactic in Takeovers,* Legal Times of Washington, Jan. 11, 1982.

An approach does exist, however, that can accommodate both the need to invalidate "manipulative" acts that interfere with or undermine the tender offer process, as well as the need to leave undisturbed forms of conduct that fall within *Marathon's* broad definition of "manipulation" but in fact do not interfere unduly with the tender offer process. While Congress in Section 14(e), 15 U.S.C. § 78n(e), unqualifiedly prohibited untrue disclosures and nondisclosures, in 1970, it added a sentence that imposed upon the SEC the duty of defining the meaning of "fraudulent, deceptive and manipulative acts and practices." The last sentence of the statute reads:

> The Commission shall, for the purposes of this subsection [i.e. § 14(e) ], by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 78n(e) (1981). Not only does this sentence make clear that the Commission has a duty to help the courts and the bar in this area, it strongly suggests that the definitions of these statutory words, in this context, are expected to vary from those given the same words in other contexts. It also strongly suggests that regulated parties need, not only the guidance provided by definitions, but also the practical protection of devices designed to prevent proscribed conduct. Congress realized that great uncertainty as to the meaning of "manipulative" under this Act will persist even after definitions are evolved.

Despite the Williams Act's many years on the books, the Commission has yet to adopt many regulations defining the words "deceptive," or "manipulative" in the context of tender offers. The Commission has designated certain acts relating to the mechanics and fairness of the process as manipulative acts or practices; but none of these provisions gives any hint of the Commission's position on most forms of "lock-out" or on any other defensive tactic. 17 CFR §§ 240.14e–1, 2, 3. True, the Commission

has begun to develop, through its Advisory Committee on Tender Offers, what could in time become useful guidelines for everyday tender-offer practices. *See* 1028 CCH Fed. Sec.Law Rep. (July 15, 1983). But at this point those suggestions have no authority.

The Commission's failure as yet to have acted authoritatively does not, meanwhile, relieve the courts from their duty to construe and apply the law, as the Sixth Circuit did in *Marathon,* and as this court must in this case. But Congress' demand for, and the Commission's failure yet to provide, adequate guidance should be weighed in construing these words of the Act. First, the words should be clearly understood as having no relationship to their meaning in other, inapposite contexts, even other securities laws. The proposition that Section 14(e) and Section 10(b) are "construed *in pari materia* by the courts," *Gulf & Western Industries Inc. v. Great A. & P. Tea Co.,* 476 F.2d 687, 696 (2d Cir. 1973), is limited to the fact that both provisions are in part manifestations of the "philosophy of full disclosure" embodied in the Act of 1934. *Santa Fe Industries Inc. v. Green,* 430 U.S. 462, 477, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977). But the courts have also recognized that Section 14(e) contains the special, qualifying language "in connection with any tender offer," which makes it a provision that extends to concerns very different from those of Section 10(b). *See Panter v. Marshall Field & Co.,* 646 F.2d 271, 282–83 (7th Cir.1981), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). For these reasons, therefore, and in light of Congress' explicit recognition of the need for separate treatment of these words in Section 14(e), the three proscribed acts or practices—fraudulent, deceptive, and manipulative—should be regarded only as indicating that *some* forms of conduct that would normally fit the meanings of those expressions will violate that statute. And in light of the qualifying words of the statute, and its legislative history and aims, good sense would lead one to rule that only those forms of "manipulative" conduct that unduly interfere with the tender offer process violate the Act. Finally, the Commission's failure to define these terms through

regulations should, at least until a sufficient body of judicial or administrative standards is developed, lead courts to give those accused of such proscribed forms of conduct under Section 14(e) the benefit of reasonable doubts in the statute's enforcement. In this way the result in *Marathon* —which is justified by law and policy—can be accommodated with the practical difficulties that the decision's rationale has apparently caused.

The cases referred to by defendants can readily be seen to support or to be consistent with the principles derived here from *Marathon.* Thus, for example, *Panter,* 646 F.2d at 283, rejected Section 14(e) claims for the fundamental reason that no tender offer was ever made in the case. *See also Lewis v. McGraw,* 619 F.2d 192, 195–96 (2d Cir.), *cert. denied,* 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980). The defensive tactics suggested as proper in *Panter* are consistent with *Marathon;* a tactic upheld there was the company's policy (suggested by Joseph Flom, Esq.) of acquiring properties with its surplus cash and borrowing power, so as to avoid becoming the attractive target that companies which do not exploit their resources quite naturally become. *See Panter v. Marshall Field & Co.,* 486 F.Supp. 1168, 1183 (N.D.Ill.1980), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). The Williams Act does not require management to allow the companies they run to become or to remain attractive as takeover candidates. Defendants' reference to *Crouse-Hinds Co. v. Internorth, Inc.,* 634 F.2d 690 (2d Cir.1980), is even less explicable, since that case involved no claim under the Williams Act; the target company's directors seem to have acted consistently with their responsibilities under the business-purpose rule. Even if their conduct was properly comparable to the acts in this case, the decision would fail to aid defendants; there, the exchange of stock devised by the friendly companies seeking to merge made a takeover more difficult but not impossible, and the deal expressly reserved to the original shareholders of the target company the ultimate power to approve or reject the merger. *See id.* at 695 & n. 9. The decision in *Buffalo*

*Forge Co. v. Ogden Corp.,* 555 F.Supp. 892 (W.D.N.Y.1983), also arises from a situation vaguely similar to this action, in that an option was given to a "white knight" to avoid an unwanted tender. But the decision is entirely consistent with the result reached here, because it involved an option arrangement designed to enhance the amounts offered for the target company, and did not preclude the unwanted bidder from the victory it in fact secured. It held only—and properly—that such an option is lawful and can be exercised by the "white knight" even if it loses the contest.

Nothing in Judge Leval's carefully crafted decision in *Marshall Field & Co., v. Icahn,* 537 F.Supp. 413 (S.D.N.Y.1982), is inconsistent with either the rationale or the conclusions reached in this case. Judge Leval flatly disagreed there with "the reasoning" of *Mobil Corp. v. Marathon Oil Corp.,* 669 F.2d 366 (6th Cir.1981), and said that *Marathon's* reasoning "could unduly interfere with the right of company management to combat a takeover attempt that it believes in good faith to be harmful to its shareholders." 537 F.Supp. at 422. He continued: "In my view the securities laws do not bar management from taking action in the best interests of its shareholders even if this will make more difficult the success of a disfavored offeror." *Id.* That is consistent with the position taken here, since the Williams Act permits management to oppose a takeover attempt in any way that does not improperly deprive its shareholders of their investment decision. Concededly, under the approach proposed here, whether or not management's actions were in good faith would be beside the point in deciding a Williams Act claim, though such conduct might be a defense to state law claims, such as the breach of fiduciary duties. But a close look at Judge Leval's actions and analysis at the various stages of the Marshall Field battle demonstrates that his concern was precisely to preserve the vigor of the tender offer process involved. Thus, he began by rejecting various Marshall Field efforts to prevent the Icahn group from accumulating Field stock. *Id.* at 416–20. Subsequently, when the Icahn group sought relief from the effects of various options

and preferences Field was granting to Icahn's only viable opponent—BATUS—Judge Leval upheld the options because the prices and amounts of shares were fair and designed to encourage competition with Icahn and thereby potentially benefit Field's shareholders. *Id.* at 420–22. When Icahn complained about a right of first refusal on a valuable Field property granted to BATUS, Judge Leval expressed concern that this right "might operate in such fashion as to prevent competitive bidding for the Chicago properties." *Id.* at 421. Field then clarified the agreement to insure that the property could not be sold below fair market value. The same result was achieved when Judge Leval suggested that an agreement by which Field gave confidential information to prospective "white knights" might prevent them in fact from bidding against BATUS and thereby from providing a higher price for Icahn's stock; the Judge's informal suggestions led Field to waive its right to approve offers that could prove material. *Id.* In short, however correctly critical Judge Leval may have been of the rationale of *Marathon,* his adroit handling of the Field—Icahn controversy was designed to allow the parties to wage the most effective tender-offer war possible, within the bounds of the statute's requirements of informed action.

The single case which defendants properly characterize as inconsistent with *Marathon* is *Martin Marietta Corp. v. Bendix Corp.,* 549 F.Supp. 623 (D.Md.1982). Bendix there challenged two particularly common but complex defensive tactics. The first—characterized by Bendix as a "scorched earth" policy—was Marietta's offer to buy control of Bendix; such a policy, Bendix claimed, would nullify Bendix' successfully completed offer for Marietta and thereby deprive Bendix of the financial benefits of its offer. *Id.* at 627. The second tactic turned on the complex form in which Marietta's offer was made—loosely called an offer with "front end" enticements and less attractive "back end" consequences. In this instance, Marietta offered $75 per share for 50.3% of Bendix common stock (Bendix at the time having already acquired 58% of Marietta's common), but Marietta an-

nounced that if it succeeded in its offer it would later acquire all of the Bendix shares not tendered through a "back-end," squeeze-out merger, with Bendix shareholders receiving 1⅔ of Marietta common for each Bendix share, and no cash at all. *Id.* at 625. While the District Court refused to address these complicated devices, they are merely two of the many, everyday shenanigans engaged in by take-over specialists. If the *Marathon* rationale were rigidly enforced, these devices could all be deemed "manipulative" in that they were undoubtedly intended to affect by artificial means the prices of the securities over which the sides were battling. But conduct to be manipulative in connection with a tender proposal must undermine, rather than enhance, the tender offer process that Congress put in place for the benefit of shareholders. The court specifically found that the tactics used there did not thwart the tender offer, *id.* at 628, and no property was

being destroyed by any alleged "scorched earth" policy. To the contrary, the activities seem to have generated a furious and healthy battle, in which shareholders were destined to be presented with several increasingly lucrative opportunities, among which they would be reasonably free to exercise an informed choice.[4]

The Supreme Court's recent decision in *Edgar v. Mite Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), strongly supports these conclusions, and indicates the Court's recognition of the Williams Act's dual purposes. Justice White, writing for a plurality, found sufficiently clear federal policies in the Williams Act to justify declaring invalid under the supremacy clause certain aspects of the Illinois Business Takeover Act. Although the Court rested its holding of unconstitutionality on a commerce clause rationale, Justice White's treatment of the supremacy clause in that case is significant.[5] Section 28(a) of

**4.** The District Court in *Martin Marietta* might not have been so prepared to dismiss if it were presented with a case in which the directors were truly destroying a company's value to avoid a successful tender offer and the loss of their jobs. That is the possibility with which Judge Milton Pollack was presented in *Joseph E. Seagram & Sons, Inc. v. Abrams,* 510 F.Supp. 860 (S.D.N.Y.1981). While his opinion contains no definitive expressions on the meaning or breadth of section 14(e) of the Williams Act, his instinctive reaction to the "scorched earth" policy that the target company allegedly planned in response to a tender offer reflects the soundness of the proposition that, while the Act may permit efforts against a tender offer designed to enhance the interests of shareholders, management may not sacrifice the shareholders' best interests through devices that undermine shareholder autonomy in tender offer disputes, "merely to thwart a change in the existing stock ownership which may end the tenure of the present directors and key officers of the company." *Id.* at 861.

**5.** Justice White's plurality opinion, joined by Chief Justice Burger and Justice Blackmun, and partially concurred in by Justices O'Connor, Powell and Stevens, invalidated the Illinois Takeover Statute on supremacy clause and commerce clause grounds. Parts III and IV of Justice White's opinion, invalidating the Illinois Statute under a preemption theory, were not joined by Justice O'Connor, who felt the issue need not be reached since the commerce clause violation was sufficient to find the statute unconstitutional. Justices Powell and Stevens did

not join in parts III and IV, partially because they concluded that state law might justifiably tilt in favor of management given the disparity of power between vulnerable targets and wealthy tender offerors. Justices Rehnquist, Brennan and Marshall, dissenting on mootness grounds, expressed no opinion on the merits.

Although Justice White's supremacy clause analysis is not a majority holding, it affords persuasive authority for a view of the Williams Act that had already attained significant following. In addition to the Seventh Circuit decision affirmed in *Mite Corp.* notable Fifth and Third Circuit opinions have also held that the Williams Act preempts conflicting state laws. *See Great Western United Corp. v. Kidwell,* 577 F.2d 1256, 1277 (5th Cir.1978) *reversed on venue grounds sub nom. Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979); *Kennecott Corp. v. Smith,* 637 F.2d 181, 184–85 (3rd Cir.1980). Justice White's preemption analysis, confirming the approach of the Seventh, Third, and Fifth Circuits, represents the most authoritative statement of the balance to be struck between state and federal law where the Williams Act and state corporation laws conflict. Moreover, none of the five separate opinions in *Mite Corp.,* intimated that the scope of the Williams Act was limited by *Chris-Craft* or *Santa Fe,* or countered Justice White's theory that the Williams Act embraces substantive guarantees of neutrality and access to the tender offer process. Even the partial concurrence of Justice Powell, which suggests that a conflicting state takeover statute would be defensible to the

the 1934 Act, the opinion noted, provides that "[n]othing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any state over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder." *Id.* 102 S.Ct. at 2635 (quoting 15 U.S.C. § 78b(a)). Therefore, the decision was made in the context of a statute that explicitly permits states to regulate takeovers, so long as state legislation does not conflict with provisions of federal law. Furthermore, the case was not one in which it would have been impossible for the plaintiff to comply with both the provisions of the Williams Act and the more burdensome requirements of the Illinois law. The question was whether the Illinois Act frustrated objectives of the Williams Act in some substantial way, a test that required examination of the Williams Act's objectives.

Justice White's opinion reviewed the many disclosure requirements imposed upon tender offerors by the Williams Act, and explained how the law originated as a measure to protect the investor and in the process was originally pro-management in that it helped target companies to defeat takeover bids. *Id.* 102 S.Ct. at 2635–37. Adding significantly to the reading in *Chris-Craft,* however, the opinion quoted legislative history to the effect "that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management." *Id.* 102 S.Ct. at 2636 (quoting S.Rep. No. 550, 90th Cong., 1st Sess. 3 (1967)). The opinion therefore read the legislative history as reflecting a policy of "even handedness," *id.* (quoting *Chris-Craft,* 430 U.S. at 31, 97 S.Ct. at 944), in which "neither side in the contest should be extended additional advantages vis-a-vis the investor, who if furnished with adequate information would be in a position to make his own informed choice." 102 S.Ct. at 2636. The opinion then went on to say in language highly significant to the evalua-

tion of the propriety of defensive tactics by takeover candidates:

> We, therefore, agree with the Court of Appeals that Congress sought to protect the investor not only by furnishing him with the necessary information but also by withholding from management or the bidder any undue advantage that could frustrate the exercise of an informed choice.

*Id.* 102 S.Ct. at 2636–37. The Congress had no intention, "'to do ... more than give incumbent management an opportunity to express and explain its position,'" *id.* 102 S.Ct. at 2637, (quoting *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975)). "Once that opportunity was extended, Congress anticipated that the investor, if he so chose, and the takeover bidder should be free to move forward within the time-frame provided by Congress." 102 S.Ct. at 2637.

Based on this view of the purposes of the Williams Act, Justice White agreed with the Court of Appeals for the Seventh Circuit that three provisions of the Illinois Act violated the supremacy clause. First, the provision that required a tender-offeror to notify the Secretary of State and the target company of its intent to make a tender offer and its material terms twenty business days before the offer became effective was declared invalid, because it gave incumbent management "a powerful tool to combat tender offers, perhaps to the detriment of the stockholders who will not have an offer before them during this period," and these consequences are "precisely what Congress determined should be avoided...." *Id.* (footnote omitted). The hearing provisions of the Illinois Act were found to frustrate the congressional purpose of the Williams Act, because they too delayed the effectiveness of tender offers. *Id.* 102 S.Ct. at 2637–39. Finally, the Supreme Court invalidated the provision in the Illinois Law that would have permitted the Secretary of State of Illinois to pass upon the substantive fairness of tender offers. 102 S.Ct. at 2639. The opinion makes clear

extent it corrects imbalances of power between Williams Act contestants, is based on a theory

essentially compatible with Justice White's opinion.

its view that the Williams Act is not designed to guarantee fairness, but only to guarantee that shareholders be permitted a fair opportunity to exercise their choice:

> The Court of Appeals understood the Williams Act and its legislative history to indicate that Congress intended for investors to be free to make their own decisions. We agree. Both the House and Senate Reports observed that the Act was "designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision." H.R.Rep. No. 1711, 90th Cong., 2d Sess. 3 (1968); U.S.Code Cong. & Admin.News, pp. 2811, 2813; Senate Report at 3. Thus, as the Court of Appeals said, "[t]he State thus offers investor protection at the expense of investor autonomy—an approach quite in conflict with that adopted by Congress." [*Mite Corp. v. Dixon*] 633 F.2d, [486] at 494 [ (7th Cir. 1980) ].

*Id.* 102 S.Ct. at 2640.

The notion that the reasoning in *Edgar v. Mite Corp.,* can be distinguished as inapplicable to private suits seems unsound. In our federal system, and in connection with a statute that expressly condones state regulation, it would appear to follow that any restriction that the Supreme Court imposes through the supremacy clause upon a State in regulating tender offers should apply to similar interference by private persons. The courts invalidate state laws only when Congress is found to have expressed an inconsistent purpose, and if that purpose cannot be undermined by States, it should, absent strong evidence of a contrary intent, be protected against similar private conduct. The actions of Datatab and CRC interfere more egregiously with Congress' purposes than those invalidated in *Edgar v. Mite Corp.* Thus, if state law provisions are invalid because the extra time they impose upon a tender offeror reduces the tender offeror's possibility of succeeding, even less acceptable is the option agreement

between Datatab and CRC which makes success by the tender offeror impossible by aborting the tender offer process. Most tellingly, if Illinois may not call upon its Secretary of State to judge whether an offer is equitable because investor autonomy is thereby denied, how much less justifiable is the sacrifice of stockholder autonomy here, not by the act of a public official seeking to do justice for shareholders, but by the actions of executives of two private companies seeking to advance their own professional and personal interests. Assuming, however, that the decision in *Edgar v. Mite Corp.,* applies only in the context of preemption allegations, under Justice White's analysis, those provisions of New York Corporation Law, N.Y. Business Corporation Law §§ 501, 505 (McKinney's, 1983), which permit boards of directors to grant options to purchase authorized but unissued shares without shareholder approval, would be preempted by the Williams Act to the extent they allow an option to be used to abort an ongoing tender offer process. *See Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979); *Marino v. Town of Ramapo,* 68 Misc.2d 44, 326 N.Y. S.2d 162 (1971) (State competitive bidding provisions, viable for all other purposes, are preempted to the extent they undermine goals of HUD turnkey program). Finally, irrespective of the decision's authority as a basis for invalidating the devices adopted in this case, it remains strong evidence (written by the Justice who authored *Santa Fe* )· that the Court will recognize that the Williams Act has federally enforceable objectives, beyond mere disclosure.

The principles governing Williams Act suits, concededly applicable even by defendants to this complaint's disclosure claims, and as developed above with respect to the allegedly illegal use of a lock-out option, demonstrate that defendants have violated both the Act's disclosure requirements and its prohibition against manipulative acts.[6]

---

6. In contrast, plaintiff's demand that the indemnification agreement between CRC and Datatab's officers be found void as against public policy is not a suitable issue for determination by this court. The Datatab defendants have

made no claim for attorney's fees, and any liability for such a claim would initially be shouldered by CRC shareholders. It may be that "to tolerate indemnity under these circumstances would encourage flouting the policy of

### A. Datatab's Failure to Disclose Material Information.

Plaintiffs have charged Datatab with violating both the proxy statement disclosure provisions of Section 14(a) of the 1934 Exchange Act, and the proscription in Section 14(e) of the Williams Act against omissions of material fact from statements made in connection with tender offers. These charges stem from a letter of July 1, 1983 addressed by Datatab to its stockholders, described above. Plaintiffs assert that this letter constitutes a proxy solicitation and is governed by the rules promulgated under Section 14(a), specifically Rules 14a–9, 17 C.F.R. § 240.14a–9, and 14a–12, 17 C.F.R. § 240.14a–12.[7] Defendants counter that the letter was intended solely to comply with the requirements in Rule 14e–2, 17 C.F.R. § 240.14e–2, promulgated under Williams Act Section 14(e), that subjects of tender offers notify their shareholders within ten business days after the offer of management's position concerning the tender offer.

The letter itself is ambiguous; it is couched as an announcement of the amended CRC merger agreement, and says little about Data Probe's tender offer. The first three paragraphs discuss the merger agreement, and the new price of $1.40, the CRC loan of $210,000 operating capital, and the stock option granted to CRC. The fourth paragraph informs stockholders of the new date of the stockholders' meeting at which the merger proposal will be considered, and states that supplemental proxy material and proxy cards will be forthcoming. It informs stockholders that the Board has approved and will recommend the CRC merger. Only the fifth and last paragraph deals with the Data Probe tender offer. The paragraph reads in its entirety:

> In view of the new $1.40 per share merger offer from CRC, the Board recommends that you *not* tender your shares for the $1.25 price which is offered by Data Probe Acquisition Corp. If you have already tendered your shares, you may withdraw them at any time prior to midnight, New York City time, on July 12, 1983.

■ Defendants seem to believe that this letter cannot be construed as a Rule 14a proxy solicitation, because it was intended as a Rule 14e–2 statement of position. But the two categories are not mutually exclusive. Datatab's letter has a dual purpose; it serves as a proxy solicitation vis-a-vis the merger agreement, at the same time as it

---

the common law and the Securities Act," *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1288 (2d Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), but "the decision as to whether review [of the indemnification agreement's propriety] will be sought [should be] in the hands of those who have a direct stake in the outcome," *Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 1369, 31 L.Ed.2d 636 (1972). *See also Flast v. Cohen,* 392 U.S. 83, 102–03, 88 S.Ct. 1942, 1953–54, 20 L.Ed.2d 947 (1968). In this case, the CRC shareholders, not Data Probe, are the parties who may be adversely affected by the indemnification agreement and they may well choose to bring a claim in state court when and if officers of Datatab seek to enforce the agreement. The relief sought is, further, more akin to a suit for damages by a tender offer contestant, proscribed by *Chris-Craft,* than a request for injunctive relief; its resolution has little if any bearing on the tender-offer process in this case.

**7.** A letter which does not request the giving of a proxy authorization is still subject to the Proxy Rules if it is "part of 'a continuous plan' intended to end in solicitation and to prepare the way for success." *Studebaker Corp. v. Gittlin,* 360 F.2d 692, 696 (2d Cir.1966). The fact that the letter is couched as an announcement of the new merger plan and that the greater part of the letter describes the amended merger agreement confirms that its purpose and foreseeable result was to influence stockholders to vote in favor of the plan. Furthermore, while the SEC allows a solicitation to be made prior to the furnishing of a written proxy statement meeting the requirements of Rule 14a–3(a), if such solicitation "is made in opposition to ... an invitation for tenders ..., which if successful, could reasonably have the effect of defeating the action proposed to be taken at the meeting," 17 C.F.R. § 240.14a–12(a)(1), such communications must nevertheless conform to the requirement in Rule 14a–9 that "[n]o solicitation subject to this regulation shall be made ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ...," 17 C.F.R. § 240.-14a–9.

states management's position regarding the tender offer. Nevertheless, while the letter's failure to explain to shareholders that, among other things, CRC's exercise of its irrevocable 200% stock option would disenfranchise the shareholders in an eventual merger vote, constitutes a serious omission of a material fact, Datatab correctly argues that these omissions can easily be cured before the actual merger decision by full disclosure of all material facts in amended proxy statements, which should also inform stockholders of the outcome of this litigation. In view of the lack of probable reliance, the opportunity to cure, and Datatab's expressed intention to do so, the 14(a) claim is not a proper subject for injunctive relief. *Cf. Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 380 (2d Cir.1980) (deficiencies in 13D filing cured by subsequent filings).

More serious is the charge that the July 1 letter violates the disclosure provisions and the duty to refrain from misleading statements which the Williams Act imposes on participants in tender-offer battles. The timing of the letter, less than two weeks before the date for withdrawal of tendered shares, meant that shareholders could be expected and, in fact, were expressly encouraged to refrain from tendering or to withdraw tendered shares on the strength of management's representations. In *Lewis v. McGraw,* 619 F.2d 192, (2d Cir.), *cert. denied,* 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980), the Second Circuit noted that reliance may be presumed in a 14(e) claim where circumstances make such a presumption logical; "[i]njunctive relief ... may be available to restrain or correct misleading statements made during the period preceding a tender offer where ... reliance upon the statements at issue is probable under the circumstances." *Id.* at 195; *see Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 362–63 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). Section 14(e) was designed "to insure that [investors] will not be required to respond [to a tender offer] without adequate information. . . ." *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075–76, 45 L.Ed.2d 12 (1975).

In line with this goal, Section 14(e) of the Williams Act, in language virtually identical to that of Rule 14a–9, proscribes any person from making misleading statements in connection with a tender offer or omitting to state material facts necessary to make the statements made not misleading.

Defendants maintain that their duty of disclosure concerning their opposition to the tender offer was defined by Rule 14e–2 and was entirely satisfied by compliance with that rule in that they sent a letter which identified *a* reason for their opposition. This position is at odds with the instructions in Rule 14e–2, and defeats the express remedial purpose of Section 14(e). If Datatab's approach to Rule 14e–2 were the law, management's position statement could become an empty formality.

Rule 14e–2 states in relevant part that "[a]s a means reasonably designed to prevent fraudulent, deceptive or manipulative acts or practices within the meaning of Section 14(e) of the Act, the subject company, no later than 10 business days from the date the tender offer is first published or sent or given, shall publish, send or give to security holders a statement disclosing that the subject company: (1) Recommends acceptance or rejection of the bidder's tender offer .... (3)... Such statement shall also include the reason(s) for the position ... disclosed therein." 17 C.F.R. § 240.14e–2.

The July 1 letter is inadequate as a statement of reasons for Datatab's position, and fails to provide the stockholders with the information most relevant to an informed decision. The intent of the Williams Act was to protect security holders by giving management an opportunity "to furnish any information at its disposal pertinent to the merits of the offer before the security holder responds to it." Senate Hearings at 19. At the same time, as SEC Chairman Cohen testified, "protection [was] needed against any management efforts designed to resist bids when the information furnished may be given in the context in which the desire to obtain and retain existing emoluments may make difficult impartial and complete disclosure of relevant facts."

*Id.* It is no accident that the rule requiring management to state its position is promulgated under the section of the Act prohibiting material omissions or misstatements, fraud, deception, and manipulation.

At the fact finding hearing of July 24, 1983, Datatab's management suggested a number of possible reasons for opposing the Data Probe offer, including Data Probe's less sophisticated technology, and the apparent inexperience of Data Probe's principal officer in the field of market research. The July 1 letter is silent as to these matters. Its sole explicit reference is to price per share. The letter also fails to mention the guarantee of three-year employment contracts negotiated by Mr. Adams and other officers of Datatab as part of the CRC merger agreement, and Data Probe's refusal to agree to such contracts. Datatab contends that this did not figure in its position, and that its officers' interests mirrored those of the Datatab shareholders, since they too stood to gain from a higher price per share for the 70,000 shares owned by them. The officers stood to gain far more, however, from a three-year contractual commitment by CRC to pay them, in addition to $1.40 per share, the agreed-upon salaries and bonuses, than from Data Probe's subsequent $1.55 per share tender offer, with no employment commitments. The differences in salary and tenure arrangements were in fact significant to the officers, and to the shareholders as well, and their omission from the disclosures to the Datatab shareholders violated Section 14(e). "[O]nce a company undertakes partial disclosure ... there is a duty to make the full disclosure of known facts necessary to avoid making such statements misleading." *Panter v. Marshall Field & Co.,* 646 F.2d 271, 292 (7th Cir.1981).

Defendants further contend that statements concerning the stock option are not governed by Section 14(e) because the option was not entered into in connection with the Data Probe tender offer but rather in connection with the CRC merger. As Judge Weinfeld has indicated, where a separate transaction such as a stock purchase agreement is entered into with the sole purpose of defeating a tender offer, *any*

public statements concerning that transaction must be considered to have been made "in connection with" the tender offer and are thus subject to the Section 14(e) requirement that they not be misleadingly incomplete. *Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.,* 425 F.Supp. 1145, 1160 (S.D.N.Y.1977); *see also Lewis v. McGraw,* 619 F.2d 192, 195 (2d Cir.1980), *cert. denied,* 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980) (applying the reasoning of *Milgo, supra,* to a statement which preceded a tender offer and finding that it may be held to have occurred "in connection with" such offer).

The July 1 letter is deceptive in its treatment of the stock option. Nowhere does it state that the option represents a potential 200% increase over the number of shares outstanding, nor that its exercise would end further bidding by Data Probe or any other potential offeror, nor that Datatab management had information suggesting that Data Probe would increase its offer in response to CRC's $1.40 proposal. The Second Circuit's analysis of a similar failure to disclose in *SEC v. Parklane Hosiery Co.,* 558 F.2d 1083 (2d Cir.1977) seems particularly apposite. In *Parklane* a proxy statement was held to violate Section 14, because it failed to disclose that the overriding purpose for a "going-private" merger was to enable the principal shareholder of the defendant company to repay his personal indebtedness. The defendant asserted, without success, that it had adequately disclosed the pertinent facts by noting that "[t]he merger will make possible a combination of the resources of the Company with those of Mr. Somekh ... for the conduct of real estate activities of the type that Mr. Somekh has to date conducted individually ...." *Id.* at 1086 n. 2. Datatab's disclosure of the *existence* of the option agreement in connection with the merger plan, without any hint of its impact on the tender offer battle, was equally deceptive.

The information not disclosed was material to a shareholder's evaluation of the opportunities presented in the tender-offer dispute, and Datatab's failure to supply it is a type of deception the Williams Act was

designed to prevent. The Senate Report on the Act states that Section 14(e) "would affirm the fact that persons engaged in making of opposing tender offers or otherwise seeking to influence the decision of investors or the outcome of the tender offer are under an obligation to make full disclosure of material information to those with whom they deal." S.Rep. No. 550, 90th Cong., 1st Sess. 11 (1967). The materiality of the information withheld must be judged by whether the fact would have assumed "actual significance" in a shareholder's deliberations. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 444–49, 96 S.Ct. 2126, 2130–32, 48 L.Ed.2d 757 (1976). In this case, as in *Parklane Hosiery,* the materiality of the non-disclosed information is established by the fact that it could have been used by shareholders to mount an action for injunctive relief under the Williams Act or, even if no federal remedy exists, a state court action to enjoin the merger, strike down the option agreement, or petition for a ruling requiring shareholder approval. *See Parklane Hosiery,* 558 F.2d at 1088; *cf. Goldberg v. Meridor,* 567 F.2d 209 (2d Cir.1977). Datatab's July 1 letter therefore constitutes a misleadingly incomplete statement of reasons in violation of Rule 14e–2.

### B. *Invalidity of The Lock-Up Option.*

The legislative history and decisions discussed above support the proposition that Congress in the Williams Act intended, not only to insure that investors were properly informed, but that they would be able to exercise their choices in tender offer disputes without undue interference. Neither management nor the bidder is permitted to engage in "manipulative" or other acts in violation of Section 14(e), but manipulation here is restricted to those acts that unduly obstruct the exercise of informed shareholder choice. This standard contemplates that the parties to tender offer battles will have considerable latitude to engage in acts that may fit the definition of "manipulative" enunciated in *Marathon,* but which will be lawful because they fairly can be said to have had the design or effect of enhancing informed and effective shareholder choice. Thus, the Act's aim of neutrality between offeror and offeree in the tender-offer process does not mean that management need be neutral in all aspects of its conduct. To the contrary, fiduciary law requires management's allegiance to be with the interests of the target company and its owners. Furthermore, the Williams Act does not envision passivity on management's part. It expressly requires management to inform the shareholders of all required facts, and it must be construed to permit and encourage management to explain and to evaluate the complex arrangements that have become a routine part of today's tender-offer process. *Cf. SEC v. Parklane Hosiery, supra.* Finally, while the Act protects the integrity of the bidding process as a device for the sale of corporate ownership, it should be construed to permit management to resort to tactics—even those characterized as "defensive" or "lock-out"—when their purpose and effect is to enhance the shareholders' prospects, such as to attract rather than to repel competitive bidding.

As difficult as these principles are to apply in the real world, the task of determining the propriety of management (and offeror) conduct in takeover proceedings must in all respects significant to the fundamental objectives of the Williams Act fall to the federal courts as a matter of federal law. Suggestions that management tactics in tender offer battles should be measured against the "business judgment rule;" that management disloyalty to shareholder interests should be tested by fiduciary standards; and that the only protection against alleged losses in the recovery of value in the sale of shares is an after-the-fact appraisal proceeding; would leave the Williams Act ineffective as a mechanism for assuring shareholder choice. Furthermore, such suggestions would relegate stockholders with federal rights to the state courts or to state law principles, where those rights would be variably enforced, and possibly rendered meaningless because of lax state standards or procedures. As *Edgar v. Mite Corp.* reminds us, Congress explicitly recognized

the importance of speedy determinations of tender-offer controversies.

Developing federal standards to govern Williams Act claims is well within the judiciary's competence. The federal courts are blessed with a bar in this complex and interesting area of law, so able and so practically astute, that through reasoned controversy among themselves they are certain to narrow considerably the range of possible judicial error. We have also available to aid us on most if not all the specific areas of difficulty that are likely soon to be presented, the guidelines and judgments of public institutions and private practitioners in this field. The SEC in particular has a legislative mandate that it is moving slowly but carefully to satisfy, and it should eventually address the complex, new problems posed for shareholders by the obscure and sometimes coercive nature of the financial terms that tender offers are increasingly assuming. Finally, while we await further expressions of informed wisdom, the classic, common-law technique of case-by-case adjudication will serve to avoid error, and at the same time provide useful indications of the directions in which the law seems destined to move, absent legislative alteration.

The present case illustrates these advantages and the tenability of federal-court supervision. The attorneys in this case, and attorneys who practice law in this area, have argued and written on the specific subject of the use by target corporations of option agreements in tender-offer disputes.[8] Experienced and respected practitioners who represent offerors as well as target corporations, have suggested how options— sometimes inappropriately called "lock ups" —can be and occasionally are used in ways that are consistent with Williams Act objectives. Kenneth Bialkin has suggested, for example, how an option may be necessary to attract a competing bid against a well-heeled offeror, or to obtain an advantageous merger agreement. Bialkin, *Court Casts Cloud over Option Tactics in Takeovers,* Legal Times of Washington, Jan. 11, 1982, at 19. Involvement in tender-offer disputes has become a costly venture. Bids must be analyzed, financing arranged, counsel consulted, and filings and challenges to others' filings prepared, all of which require time, effort, and money. An option in the range of 15%–20% has been found, in recent experience, to provide a sufficient incentive to attract interested bidders, not solely or even primarily because the option serves as a "leg-up," but because the option enables the tender offeror to acquire a sizable block of stock at an early price, full and fair at the time it is given but low enough to permit a decent profit if active management succeeds in helping to engineer bidding. The profit

**8.** A burgeoning literature has developed on the propriety of defensive tactics in takeover bids. Notable among the available sources are Bebchuk, *The Case for Facilitating Competing Tender Offers,* 95 Harv.L.Rev. 1028 (1982); Bialkin, *Court Casts Cloud over Option Tactics in Takeovers,* Legal Times of Washington, Jan. 11, 1982; Easterbrook & Fischel, *Takeover Bids, Defensive Tactics, and Shareholders' Welfare,* 36 Bus.Law 1733 (1981); Easterbrook & Fischel, *The Proper Role of a Target's Management in Responding to a Tender Offer,* 94 Harv. L.Rev. 1161 (1981); Fischel, *Efficient Capital Market Theory, the Market for Corporate Control, and the Regulation of Cash Tender Offers,* 57 Tex.L.Rev. 1 (1978); Fraidin & Franco, *Lock-Up Arrangements,* Rev. of Sec.Reg. 821 (Nov. 4, 1981); Gelfond & Sebastian, *Reevaluating the Duties of Target Management in a Hostile Tender Offers,* 60 B.U.L.Rev. 403 (1980); Gilson, *A Structural Approach to Corporations: The Case Against Defensive Tactics in Tender Offers,* 33 Stan.L.Rev. (1981); Herzel & Colling, *Limits on Takeover Defenses,* Nat'l L.J., Mar. 29, 1982; Lipton, *Takeover Bids in the Target's Boardroom,* 35 Bus.Law 101 (1979); Lipton, *Takeover Bids in the Target's Boardroom: An Update after One Year,* 36 Bus.Law 1017 (1981); 1 Lipton and Steinberger, *Takeovers & Freezeouts* § 69,290 (1978); Lynch & Steinberg, *The Legitimacy of Defensive Tactics in Tender Offers,* 64 Cornell L.Rev. 901 (1979); Nathan, *Lock-Ups and Leg-Ups: The Search for Security in the Acquisitions Market Place,* P.L.I., Thirteenth Annual Institute on Securities Regulation 13 (1981); Steinbrink, *Management's Response to the Takeover Attempt,* 28 Case W.L.Rev. 882 (1978); Wachtel, *Special Tender Offer Litigation Tactics,* 32 Bus.Law 1433 (1977); Note, *Lock-Up Options: Toward a State Law Standard,* 96 Harv.L.Rev. 1066 (1983). Many of the suggested defensive techniques in the sources referred to above would clearly be unlawful under the test applied in this opinion.

made by the favored bidder (or bidders) in such situations is relatively modest, but experience has indicated it is sufficient to cover all or much of the bidder's costs. *See* Fraidin and Franco, *Lock-Up Arrangements,* 14 Rev.Sec.Reg. 821, 823 (1981).

The principal markets in which tender contests occur have recognized, as have professionals who function in them—regulators, investors, arbitrageurs, attorneys and others—that within a range of up to about 20% options to tender offer contestants may in particular cases help begin an auction, or attract higher prices for stockholders. A New York Stock Exchange rule prevents companies from listing newly issued stock that would increase the company's outstanding shares by more than approximately 18.5% without shareholder approval. The American Stock Exchange has a similar rule permitting issues of up to about 19.5%. *See* N.Y.S.E. *Company Manual* A–283; AMEX, *Company Guides* §§ 713, 714. Though not expressly applicable to tender offer situations, these rules have, in real disputes, functioned to set limits on options to sell stock in the tender offer process to a preferred bidder without shareholder approval. Recently, when the SEC called together a distinguished group of interested and experienced participants, observers, and scholars of the tender offer process, the group recommended with virtual unanimity that companies be permitted to offer options in tender battles of up to 15% without shareholder approval; any amount above the level, they suggested, would be consistent with the Williams Act only if approved by the shareholders, presumably on proper notice. SEC Advisory Committee On Tender Offers, 1028 Fed.Sec.Law Rep. (CCH) 44 (July 15, 1983).

The option granted by Datatab management in this case differs dramatically from those that experience and logic have shown to be potentially consistent with the aims of the Williams Act. In the midst of a battle for control, and after a tender offer had been made by Data Probe,

Datatab management claims that it was forced to capitulate to CRC's demand for what was in fact a "lock-out" option in order to convince CRC to offer $1.40 for its shares. Datatab was by then in no position to claim that the $1.25 it had been offered by Data Probe was so inadequate that extreme measures were justified; indeed, management had only recently presented Datatab's stockholders with expert appraisals justifying the reasonableness of the merger originally proposed at $1.00 per share. Furthermore, the record is uncontroverted that an active bidder was still on the scene, and had expressed tangible interest in offering an even higher price without the need for any option advantage.[9] Moreover, CRC did not seek in the option a vehicle for recouping some or all of the costs incurred in the friendly merger originally contemplated, or that might be incurred in a further battle. Most likely, Datatab's officers, determined to sign with CRC rather than with Data Probe, either proposed or readily acceded to the preclusive option. In any event, they concede that they agreed to the option without inviting a further response from Data Probe, which as subsequent events have shown would have been forthcoming. And they at no time sought to explain why Data Probe's offer of $1.25 should be rejected without any further inquiry or bidding. If the company's officers had doubts about the truth or adequacy of Data Probe's interest, disclosure, capabilities, or explanations, this conceivably might have justified so drastic an option after shareholder approval, but in no event would have justified its unilateral adoption once a tender offer had been made.

The security and working conditions of a management team is of paramount importance to a venture's success. But no motive, however related it might be to shareholder interests could justify the option granted here. The shareholders were entitled by the Williams Act to have placed

---

9. In fact, defendant Adams' notes (D.X. 1) taken during the restaurant meeting with Bachana, prove that the defendants knew Data Probe was likely to counter CRC's offer. The notes

show that one of the questions Adams asked of Data Probe was: "what if? (3) CRC counter offer," and they indicate Bachana answered: "We will take what steps we have to."

before them any further, competing offer by Data Probe, and to decide without management's overriding control whether to accept that offer or perhaps even some other, competing proposal. But the stockholders were deprived of any real choice. Their vote on the revised merger was sought only after an arrangement was made that aborted the tender offer process, and enabled CRC to mandate the acquisition through the exercise of its option. The arrangement therefore lacks any semblance of justification consistent with the Williams Act's objectives.

### IV. Conclusion

Congress recognized in the Williams Act that the consternation sometimes expressed in response to the principle that shareholders be permitted to sell their shares to the highest bidder, even in an informed auction, may represent the reaction of an entrenched, managerial class intent on retaining and exercising, without legally possessing, the prerogatives of corporate ownership. The separation in American industry of ownership and control, long recognized, has led inevitably to contests among would-be managers for the economic, social, and political fruits of managerial authority. *See generally* W. Cary & M. Eisenberg, *Cases and Materials on Corporations* 208–212 (5th ed. 1980), discussing among other sources the classic Berle & Means, *The Modern Corporation and Private Property* (1932). These contests are, ultimately, the principal device by which efficiency is attained in a free society that continues to prize its relatively unregulated economy.

Having been presented with the full range of options for regulating these contests, Congress chose the option of an informed but free market for corporate control. *See* Werner, *Management, Stock Market and Corporate Reform: Berle and Means Reconsidered,* 77 Colum.L.Rev. 388, 402–04 (1977). In the Williams Act Congress requires the contestants for control to reveal the information necessary to permit informed choice; and it entrusts that choice, not to managers, would-be managers, state legislatures, government regulators, or courts, but ultimately to the stockholders themselves, the owners by right of the properties at issue, thereby encouraging the continued attractiveness of capital investment in American industry. The Williams Act confers upon the federal courts the duty to insure that this market function intelligently and vigorously, without the use of measures that grant "undue" advantages and thereby "frustrate the exercise of an informed choice." *Edgar v. Mite Corp., supra,* 102 S.Ct. at 2637.

The option agreement entered into between Datatab and CRC is declared void, and Datatab is found also to have violated its disclosure obligations under Section 14(e). This judgment will be entered in plaintiffs' favor with costs.

SO ORDERED.