**MARSHALL FIELD & COMPANY,
Plaintiff,**

v.

**Carl C. ICAHN et al., Defendants.**

**No. 82 Civ. 0755 (PNL).**

United States District Court,
S. D. New York.

Feb. 16, 1982.

On Renewal of Motion for Temporary Restraining Order March 10, 1982.

On Motion for Preliminary Injunction March 23, 1982.

On Application for Temporary Restraining Order Re Tender Offer March 26, 1982.

Skadden, Arps, Slate, Meagher & Flom, Douglas M. Kraus, Daniel E. Stoller, Timothy A. Nelsen, Jemera Rone, Bradley Holmes, New York City, for plaintiff and counterclaim-defendant Marshall Field & Co.

Ronald S. Rolfe, Alan C. Stephenson, Henry B. Gutman, Cravath, Swaine & Moore, New York City, for BATUS, Inc., BATUS Holdings I, BATUS Holdings II.

Theodore Altman, Mathew E. Hoffman, Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov, and David Simon, Michael O. Finkelstein, William O. Purcell, Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for defendants Carl C. Icahn, Icahn Capital Corporation, Icahn & Co., Inc., C. C. I. & Associates and Brett Investors Corp.

Edward G. Turan, Leonard Benowich, Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant Bayswater Realty & Capital Corp.

Edward Brodsky, Thomas H. Sear, Edward J. Westlow, Spengler, Carlson, Gubar, Brodsky & Rosenthal, New York City, for defendants Alexander M. Goren, Establissement Dan-Elath Investment and Picara Valley N. V.

Herman Sassower, Barry R. Fertel, Bell, Kalnick, Beckman, Klee & Green, New York City, for defendants Philip S. Sassower and Lawrence I. Schneider.

## OPINION

LEVAL, District Judge.

Schedule 13D, Item 4, of the Securities Exchange Commission's Regulations requires reporting persons who have acquired the requisite amount of securities of the issuing corporation to state in their filing under Section 13D the purposes of the acquisition. Among the possible purposes that must be reported are

> (b) An extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the issuer or any of its subsidiaries; (c) A sale or transfer of a material amount of assets of the issuer ...; (f) Any other material change in the issuer's business or corporate structure ....

20 C.F.R. § 240.13d–101 (1981); *see GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). In this case the only statement of such purpose set forth in the 13D filing is a disclaimer of any plans or proposals "to liquidate the Issuer, sell its assets, merge it with any other person or persons, or make any other major change in its business or corporate structure."

There is some substantial proof in the evidence submitted after a few days of hasty discovery to the effect that the defendants have formulated tentative purposes which would include extraordinary corporate transactions, material sales of assets and material changes in Marshall Field's business. The evidence, although sketchy and incomplete, suggests that the motivation for the sudden attempt to acquire effective control of Marshall Field (involving the investment of what may well run to $70,000,000) may be a perception that the real estate assets of the company are worth far more on a liquidation basis than the going business value of the retailing concern. This is the conclusion expressed in a study prepared for Mr. Icahn last year. There is also sketchy evidence that the purchasing group has already formulated some tentative plans as to how cash raised in the liquidation of certain real estate assets might be invested, including the acquisition of undervalued companies.

Although mindful of the Court of Appeals' warning that Congress did not intend "to impose an unrealistic requirement of laboratory conditions that might make [the Williams Act] a potent tool for incumbent management to protect its own interest against the desires and welfare of the stockholders," *Electronics Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969), and of the warning of the Fifth Circuit that a registrant should not be required to make predictions of future behavior which may result in unjustified reliance by the public investor, *Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1083–84 (5th Cir. 1970), I nonetheless question whether an acquirer of control whose acquisition is motivated primarily by plans, however tentative, which would seriously alter the structure and business of the acquiring company, is not obligated under the statute and regulations to inform the marketplace of the kind of plans being considered. Such advice can and should when appropriate be written in properly tentative language to avoid creating unjustified reliance.

A comparison of the evidence of such purposes with the broad disclaimer in the 13D statement of any plans or proposals suggest that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Jackson Dairy Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam).

I conclude also that irreparable harm is present if the investing public and the present shareholders of Marshall Field are trading in a market place which is deprived of important and legally required information as to the acquiring group's intentions which may affect their judgment as to whether the stock should be sold, bought, or held.

I find also that the balance of hardships, at least for a brief period, tips decidedly in favor of the grant of relief. The hardship to the investing public and the issuer's shareholders is that mentioned in the preceding sentence. The defendants have submitted no proof of hardship which they would suffer by reason of a brief court-imposed restriction on further purchases.

I have therefore concluded that a temporary restraining order should be imposed on further acquisition by the defendants of shares of Marshall Field. This Order is based solely on the question whether the Schedule 13D filing has adequately disclosed the intentions of the acquiring group with respect to the issuer's assets, corporate structure and business. It is not in any part based on the allegations made by the plaintiff company under 18 U.S.C. § 1962.

It is also contemplated that this order may be of very brief duration. The filing of an amended 13D statement which gives the public adequate information may well justify a lifting of this order so as to permit continued purchases in a properly informed market place. The order is also intended to give the plaintiff some further opportunity to conduct discovery to develop proof that would justify continuation of the restraint or entry of further orders as appropriate.

As mentioned above, I am mindful that such litigation can be misused by management for self-perpetuation in a manner which is contrary to the interest and welfare of their stockholders. I recognize the possible validity of defendants' allegations that the present application is such an abuse. The court accordingly will remain available to both sides on short notice to modify or lift the present order as circumstances indicate.

An order giving effect to the purposes of this Memorandum is being entered simultaneously.

### On Renewal of Motion For Temporary Restraining Order

Marshall Field renews its motion for a temporary restraining order enjoining the Icahn group from making further purchases of Marshall Field stock pending hearing on the preliminary injunction motion.

On February 16, 1982 I granted a temporary restraining order upon a finding of substantial questions as to whether the 13–D filing of the Icahn group adequately disclosed proposals for extraordinary trans-

actions in the event the group acquired control. On February 19, 1982 a modified schedule 13–D was filed that in my view adequately disclosed such proposals as the evidence proved were being entertained by the Icahn group. I therefore lifted the temporary restraining order.

During the period when the questionable 13–D was on file, the Icahn group purchased nearly 900,000 shares of Marshall Field stock, or about 8.7% of the outstanding stock. Since the lifting of the temporary restraining order, the group has apparently increased its ownership to approximately 23%.

Marshall Field argues that the temporary restraining order should be reimposed because the group's possession of so large a portion of the company's shares effectively dissuades any other potential offeror from making competing offers to its shareholders. It contends that the group has acquired an effective blocking position, absent a grant of restraint.

Marshall Field also contends that the present filing by the group fails to disclose adequately the group's intention to acquire control and to force the company to make extraordinary transactions.

I find that the current 13–D is adequate, measured against the evidence submitted, in disclosing that the group may persevere to acquire control and, if so, that it may cause the company to engage in extraordinary transactions to realize what it perceives to be a value in real estate assets which far exceeds the book and market value. The evidence seems to show that the group also is maintaining an open option to sell its position if offered a sufficient profit. In my view, based on the existing evidence, to require a more firm statement of intentions may be to require a false statement, and might well mislead the investing public.

Nor do I accept Marshall Field's argument that the Marshall Field shareholders are irreparably harmed by the discouragement of prospective white knights if further buying is not enjoined. It is arguable

that the Field shareholder would be equally harmed if the principal existing bidder for their shares were barred from making further offers. Furthermore, if the Icahn group were barred, management might well lose its urgency in seeking competing bidders. It is far from clear that such an injunction would benefit the existing shareholders.

I conclude there is no basis for granting the order now sought to restrain further purchases by the Icahn group.

The argument is also advanced that failure to grant relief permits Icahn to benefit from his violation of law by permitting him to use, for blocking purposes, the large number of shares which were acquired under the allegedly fraudulent misleading 13–D statement. It is true that the further discovery called to my attention tends to confirm the accuracy of my earlier judgment that the initial 13–D was deficient.

If this is so, it may well be appropriate in time to grant relief which bars the Icahn group from voting the shares acquired under the allegedly misleading 13–D. They may also be subject to suits for damages or rescission brought by uninformed or misled sellers. Additionally it is possible that they may face regulatory action if it should be found that the disclosures were intentionally misleading.

These possibilities do not, however, support the conclusion that further buying by the Icahn group should now be enjoined.

For the reasons stated above, the temporary restraining order is hereby denied.

On Motion for Preliminary Injunction

Marshall Field & Co. moves for a preliminary injunction enjoining the defendants from further purchases of Field stock, requiring rescission of previous acquisitions and, alternatively, enjoining the defendants from voting certain shares acquired by defendants under an assertedly misleading Schedule 13–D.

The defendants form a group led by Carl Icahn that has purchased a substantial percentage of the Field common stock pursuant to a program of acquisition of Field shares.

On February 16, 1982, Field sought a temporary restraining order against further purchases by the defendants. I found the existence of a substantial question on the merits whether the 13–D statement then filed by the Icahn group adequately disclosed the defendants' proposals or plans, in the event the group acquired control, to engage in extraordinary transactions respecting the company's real estate assets. Because of the high likelihood that the Field shareholders and the market place generally were being misled as to information the acquiring group was required by law to disclose, I found that the balance of hardships decidedly favored the injunction of further purchases.

Field claims that, during the effective period of the assertedly deficient 13–D filing, the Icahn group acquired 942,000 shares or nearly 9% of the stock. The defendants contend that this number should be reduced by 380,000 shares which were purchased on the day of, but prior to, the filing.

Three days after the grant of the temporary restraining order the Icahn group amended the Schedule 13–D and sought revocation of the restraining order. I found that the new statement was adequate, in light of the evidence then available, to advise the public of extraordinary proposals being considered by the Icahn group. Accordingly, I lifted the order. The Icahn group has since increased its holdings to approximately 30% of the outstanding stock.

Marshall Field has made, in the meantime, additional applications for restraining orders which I have found to be without merit and have denied. Field has also been active seeking competing tenders from a "white knight". On March 17, 1982, BA-TUS, Inc., with the support of the Field management, announced a tender offer for Field shares. The price of BATUS' offer was increased the next day.

\* \* \*

■ Field's first contention is that further purchases by the defendants should be enjoined on the ground that their 13–D filings misrepresent the intentions of the Icahn group. The argument is made with particular reference to the intention to acquire control and the intention thereafter to cause Field to make extraordinary transactions.

Recognizing that the matter remains in a preliminary stage in which findings are subject to change with further discovery of additional evidence, I conclude that Field has failed to make out these contentions in a manner calling for relief. The evidence suggests not that Icahn is operating under a firm plan to acquire control but rather that the defendant group is feeling its way with a mind open either to selling out if offered a sufficiently attractive profit or to pushing on for control if that seems preferable. In my view, based on the available evidence, to require a more definite statement of intention to acquire control may be to require a false overstatement, equally capable of misleading the marketplace.

As to plans or proposals for extraordinary transactions in the event control is obtained, I conclude that the amended filing is not inadequate or misleading when measured against the sketchy evidence available.

■ Field's alternative contention is that I should enjoin the voting of the shares acquired by defendants under the earlier 13–D filing. An argument in favor is that one who used false filings to assist him in an attempt to gain control should not be rewarded by being allowed to exercise the benefits of the fraudulently obtained stocks. Field argues that this ruling would encourage fraudulent filings with occasional correction from time to time as court decrees require.

The argument does not depend on irreparable harm which would flow from the voting of the shares or be avoided by an injunction. The argument depends rather on the policy of preserving the integrity of the requirements of the securities laws and preventing violators from profiting by the violation.

This argument has considerable force. However, strong arguments also point to

the contrary in these circumstances. First, there has been no conclusive finding that the early 13–D was false. The finding was of the tentative kind which can justify temporary relief depending on the balance of equities. It is not clear that Field will be able to prove falsity by a preponderance of the evidence when all discovery is complete and the issue is ripe for definitive trial on the merits. Second, in the event it should eventually be shown that the earlier filing was false, those deceived by it, who arguably sold out more cheaply than they would have on proper information, would obtain no benefit from the relief Field now seeks. The victims of such a false filing can be protected by an action for money damages. The benefits of the injunction would go to persons other than those damaged by the false filing.

Third, the application is premature. No shareholder vote is currently scheduled before November, eight months hence. Even assuming that injunction of the voting will eventually be justified, no irreparable harm results from failure to grant such relief at a preliminary stage based on an inconclusive record.

Field argues that refusing to grant the relief now effectively rewards the defendants for false filings since potential white knights will be deterred by the size of defendants' voting block. Since the argument was advanced, however, a white knight bidder has emerged. Furthermore, uncertainty and speculation would in any event cloud the future, for a competing tenderer relying on such a *preliminary* grant of relief would have to bear the risk that the relief provisionally granted would ultimately be rescinded. Likewise, the sophisticated marketplace will be aware that the relief of sterilization of the shares, although now premature, may well be granted at a subsequent time, either upon final trial, or in the event a vote or other circumstance arises which calls for such relief. I can see no reason to enjoin voting on a provisional and inconclusive record when no vote is scheduled for eight months—an eternity in the marketplace of tender offers and battles for control. The application, although now de-

nied, may be renewed either upon final trial or if the imminent holding of an election or other circumstance raises the threat of immediate irreparable harm.

In pressing for sterilization, Field contends that the mere possibility that the Icahn group will be able to vote the shares in the future poses an immediate threat to the success of the BATUS tender offer and the welfare of Field shareholders. First, Field argues that, if a majority of the company's outstanding shares are not tendered to BATUS, BATUS will be dissuaded from waiving its minimum condition of acceptance if it expects a proxy fight from the Icahn group armed with the voting rights to the contested shares. Second, the shareholders' current decision whether to sell now at the market price or tender their shares depends on their estimate of the ultimate success of the tender offer. That estimate in turn depends in part on the likelihood of a waiver by BATUS in the event the minimum tender condition is not met.

This argument is not persuasive. The first prong depends on the possibility that BATUS' tender will yield close to, but slightly less than, 50% of the stock. If that situation does in fact occur, there will be a further timely occasion to consider whether failure to grant relief will result in irreparable harm. As to the second prong of the argument, the preliminary relief sought here would not bring certainty to the shareholders. As noted above, the temporary injunction would not preclude the possibility that the Icahn group would eventually be allowed to vote the shares. Moreover, because lay shareholders may misconstrue preliminary relief as a final determination on the merits, a preliminary injunction might well exacerbate the problem rather than solve it.

■ Marshall Field also contends that the failure of Alexander Goren and Dan-Elath to file Schedule 13–D's justifies the entry of a preliminary injunction. Dan-Elath is the controlling shareholder of Picara Valley N. V., a filing member of the

Icahn group. Goren is the controlling shareholder of Dan-Elath. Even if this failure to file is a violation of section 13(d)(1), it is not misleading. The roles of both Goren and Dan-Elath are set forth in the current filings. The public is not being deprived of any material information. Such a violation will not support a preliminary injunction. *Treadway Companies, Inc. v. Care Corp.*, 490 F.Supp. 660, 665 (S.D.N.Y.), *aff'd in part*, 638 F.2d 357, 380 (2d Cir. 1980); *Wellman v. Dickinson*, 475 F.Supp. 783, 833 (S.D.N.Y.1979).

Marshall Field's allegation that Goren is in violation of Israeli tax laws is hotly disputed by the defendants.

■ Finally, Field contends that the defendants have violated the anti-racketeering statutes, 18 U.S.C. §§ 1961–1968 (1976), and that these violations justify preliminary relief. The RICO Act forbids, among other things, acquisition of an interest in a company through a "pattern of racketeering activity." 18 U.S.C. § 1962(a)–(b) (1976). A "pattern of racketeering activity" requires at least two acts of "racketeering activity" within the past ten years. 18 U.S.C. § 1961(5) (1976). "Racketeering activity" is defined at length in 18 U.S.C. § 1961(1)(A)–(D). One racketeering activity under § 1961(1)(D) is "an offense involving . . . fraud in the sale of securities . . . punishable under any law of the United States."

Field contends Icahn is liable under this branch of the RICO prohibitions. For proof of fraud in the sale of securities, it relies primarily on a series of civil settlements and stipulations entered into by various defendants with the SEC in earlier SEC proceedings unrelated to this litigation. These settlements admit no violations and are not themselves admissible as evidence of securities violations. Marshall Field also relies on evidence adduced in these earlier proceedings. I find that this evidence does not suffice to show a likelihood of success on the merits with respect to proving any "offense[s] involving . . . fraud in the sale of securities . . . punishable under any law of the United States." *See* 18 U.S.C.

§ 1961(1)(D) (1976). Nor do I find a balance of equities tipping in the plaintiff's favor on this claim. Nor has Field demonstrated irreparable harm flowing from the Icahn group's acquisition of Field shares.

Marshall Field's motion for a preliminary injunction is therefore denied.

### On Application For Temporary Restraining Order Re Tender Offer

■ This is an application by three members of the Icahn Group for a temporary restraining order directed against the tender offer of BATUS, Inc. for the shares of Marshall Field Company. Icahn asks the court to set back the proration date of the tender offer and to restrain BATUS and Field from taking steps in furtherance of the tender offer so long as certain agreements of Marshall Field remain in force. It is alleged that the agreements in question constitute manipulative devices in the tender offer setting which violate Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e) (1976).

The application is denied. I find that the Icahn group ("Icahn") has shown neither irreparable harm, nor likelihood of success on the merits, nor a balance of hardships tipping in its favor. The force of its argument is based on unsupported speculation.

Icahn contends that certain contractual agreements of Field, some with BATUS and some with potential bidders for control of Field, interfere with the possibility that others will compete with BATUS for control.

The first of these arrangements is a stock purchase agreement committing BATUS to purchase and Field to sell two million shares of Field treasury stock at $25.50 per share. This price was set at the time of the original BATUS tender offer and was at the same price as the tender price. The tender price was increased to the current $30 per share on the day after it was announced. Under the stock purchase contract BATUS is relieved of its commitment if it or a third party obtains 51% of Field or if it keeps its offer open until April 1, 1983.

The second is an agreement by which Marshall Field has conferred a right of first refusal on BATUS for the purchase of the properties constituting Field's Chicago Division in the event they should be sold by Field within a year after termination of the BATUS-Field merger agreement. This agreement provides that BATUS may pay with Field stock valued at BATUS' cost.

It is contended that these agreements give BATUS an improper preferred position over competition and further deter competitive bids by giving BATUS the possibility of buying Field's most valuable and important assets below their fair price.

I had expressed concern at a conference earlier this week whether the right of first refusal might operate in such fashion as to prevent competitive bidding for the Chicago properties. Thereafter a clarification agreement was entered into by BATUS and Field expressly providing that upon any exercise by BATUS of its right of first refusal, the bidding for the Chicago properties would be reopened. This clarification rebuts the contention that the property would be sold at a price below fair market value.

Icahn also contends that the provision for payment using Field stock at BATUS' cost could result in a bargain purchase if Field stock would have dropped at the time. There are two answers. First, the only stock conceivably to be used in such a transaction is the 2 million treasury shares under contract at $25.50 per share. BATUS would not likely own other Field stock unless its tender offer had succeeded in bringing it control, in which case it would not be a buyer of what it already controlled. If that is the case, Field itself has received $25.50 for those shares, selling them to BATUS at a premium. Second and more important is that the circumstance is very unlikely to arise. The first refusal comes into play only if Field (including any new management after a take-over) seeks to sell the Chicago properties within a year of the termination of the Field-BATUS merger. A new management need only wait one year to sell those assets to defeat BATUS'

rights. These contracts seem most unlikely to dissuade competitors (if any exist) from tendering for control of Field.

Third, Icahn points to two agreements of Field, one with BATUS, another made with several companies approached by Goldman, Sachs & Co., Field's agent, as potential white knight bidders for control of Field. Prior to entering into its current arrangement with BATUS, the Field management, through Goldman Sachs, "shopped" the company. Prospective "white knights" were given confidential information on which to rely in formulating bids. Field obtained letters from potential bidders committing them not to purchase Field shares without having obtained the approval of Field's board of directors. Such a provision was well justified at the time to prevent purchases utilizing inside information.

In its merger agreement with BATUS, Field committed itself to BATUS not to solicit or encourage competing bids for Field stock.

Icahn contends that these two agreements in concert prevent the signatories of the letters from making competing tender offers. Icahn contends that it is injured as a shareholder of Field by being deprived of the competitive bidding for its shares.

At oral argument, I raised the question whether, now that BATUS' tender offer had made public all the confidential information, such arrangements might effectively freeze out interested competitors for control.

Field thereupon telegraphed to all signatories Field's waiver of its right of approval for offers seeking at least 51% of the Field stock.

Icahn contends that even as modified these commitments improperly interfere with the market for competing tenders. I am convinced by Field's argument that the restrictions have a proper purpose and serve the interest of Field's shareholders. BATUS has bid for a minimum of 51% (and has committed itself to accept a much larger amount of Field's shares at a substantial premium over market. One who joined forces with Icahn's 30% holdings could top

BATUS' $30 offer, bidding for only 20% of the shares. While such a bid might be at a higher price per share, it would be detrimental to all the Field shareholders except Icahn since control could be acquired by buying far less of the Field stock than BATUS is committed to accepting. In addition, should such an offer be made, BATUS might well withdraw from the competition, eliminating all bids except for the 20% offer.

Equally important is Field's argument that the contentions of Icahn are purely theoretical. There is no indication that any potential competitor exists who is being thwarted by the contractual restriction. Field asserts that when Goldman Sachs was reviewing the bids, it advised each bidder that the time to make its best offer was at hand. None of the competing offers was sweetened. Since that time, no signatory has approached Field to request permission to bid. None has come to court asking to be relieved of the restriction. Icahn has named no entity which it contends is being restrained by the restrictive covenant.

I conclude that Icahn's argument has no practical application to the circumstances. A temporary restraining order in these circumstances would have serious adverse implications for the BATUS tender offer. Even assuming that Icahn's theoretical arguments would be sufficient to make out a violation of the Williams Act, which is far from clear, an injunction will not be issued on theoretical, speculative possibilities without any showing of harm.

\* \* \*

Apart from the absence of proof of harm, Icahn's contentions rest on a questionable legal theory. Icahn relies solely on *Mobil Corp. v. Marathon Oil Corp.*, 669 F.2d 366 (6th Cir. 1981). I doubt that decision represents the law in this circuit. In my view the reasoning of that decision could unduly interfere with the right of company management to combat a takeover attempt that it believes in good faith to be harmful to its shareholders. In my view the securities laws do not bar management from taking action in the best interests of its shareholders even if this will make more difficult the success of a disfavored offeror. The rule might be otherwise on a showing that management is acting for its own interests in violation of its fiduciary duty to its shareholders. No such showing has been made here.

But even if the *Mobil* decision represented controlling law, it does not compel an injunction on these facts. The 2 million share purchase agreement is not merely an option, although defeasible in certain circumstances. It was not set at a bargain price, even though the tender offer price was soon raised above it. The right of first refusal on the Chicago properties is not an option and is not calculated to effectuate a sale below market value. I conclude that the *Mobil* case is properly distinguished even if it represents the law.

Finally, Icahn contends that BATUS has not adequately disclosed the potential antitrust problems involved in a merger with Field. I find that the current state of disclosure is adequate to alert the shareholders to the potential problem. Perfection is not required in a tender offer. *Electronics Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969).

For the foregoing reasons Icahn's application for a temporary restraining order is denied.

SO ORDERED.