368 F.3d 138
MONY GROUP, INC., Plaintiff-Appellant,v.HIGHFIELDS CAPITAL MANAGEMENT, L.P., Longleaf Partners Small-Cap Fund, Southeastern Asset Management, Inc., or any working in connection with them or on their behalf, Defendants-Appellees.
Docket No. 04-0678.
United States Court of Appeals, Second Circuit.
Argued: April 1, 2004.
Decided: May 13, 2004.

James P. Smith III, Dewey Ballantine LLP, New York, N.Y. (Richard W. Reinthaler, John E. Schreiber, Joseph Czerniawski, Corinne D. Levy, of counsel), for Plaintiff-Appellant MONY Group, Inc.
R. Todd Cronan, Goodwin Procter LLP, Boston, MA (Gus P. Coldebella, on the brief), for Defendant-Appellee Highfields Capital Management, L.P.
Samuel Kadet, Skadden, Arps, Slate, Meagher & Flom, LLP, New York, N.Y. (Lauren E. Aguiar, Timothy K. Giordano, Gregory A. Litt, of counsel), for Defendant-Appellees Longleaf Partners Small-Cap Fund and Southeastern Asset Management, Inc.
Before: JACOBS, B.D. PARKER, Circuit Judges, and BLOCK, District Judge.*
JACOBS, Circuit Judge.

1
This expedited appeal pursuant to 28 U.S.C. § 1292(a)(1) arises against the backdrop of a proxy vote among shareholders of Plaintiff-Appellant MONY Group, Inc. ("MONY"), whose management seeks shareholder approval of a proposed merger of MONY with French insurance conglomerate AXA Financial, Inc. ("AXA"). Defendants-Appellees are institutional shareholders of MONY that oppose the merger and seek to distribute an exempt proxy solicitation to MONY shareholders under Rule 14a-2(b)(1) ("Rule 14a-2(b)(1)"), 17 C.F.R. § 240.14a-2(b)(1). This solicitation consisted of (i) a letter urging MONY shareholders to withhold their approval of the proposed merger, and (ii) a duplicate copy of the proxy card that had been sent to shareholders by MONY management after MONY had filed a proxy statement to the Securities and Exchange Commission ("SEC") under Rule 14a-3(a) ("Rule 14a-3(a)"), 17 C.F.R. § 240.14a-3(a).

2
Rule 14a-2(b)(1) exempts from SEC proxy regulations "[a]ny solicitation by ... any person who does not ... seek ... the power to act as proxy ... and does not furnish... a form of revocation" to a company's shareholders as part of the solicitation. MONY argues that the duplicate proxy card is a "form of revocation" within the meaning of Rule 14a-2(b)(1), and sought a preliminary injunction in the United States District Court for the Southern District of New York (Holwell, J.) barring Appellees from including the duplicate card with their solicitations. On February 11, 2004, the district court denied MONY's request, concluding that it was unlikely to succeed on the merits of its claim against Appellees under Section 14(a) of the Exchange Act of 1934 ("Section 14(a)"), 15 U.S.C. § 78n(a).

3
We conclude that, in the circumstances of this case — a proxy vote to authorize a proposed merger under Delaware law — a duplicate of management's proxy card, when included in a mailing opposing a proposed merger, is a "form of revocation" under Rule 14a-2(b)(1). We also conclude that MONY will suffer irreparable harm if Appellees enclose the duplicate card in their solicitations to MONY shareholders without first satisfying the disclosure regulations promulgated under Section 14(a).

Background

4
MONY is a New York-based life insurance and financial services company incorporated in Delaware and registered under the Exchange Act. Defendants-Appellees Highfields Capital Management ("Highfields"), Longleaf Partners Small-Cap Fund ("Longleaf"), and Southeastern Asset Management ("Southeastern") collectively own approximately eight percent of MONY stock. On September 17, 2003, MONY (through its management) agreed to be acquired by AXA, a French life insurance and financial services conglomerate, in an all-cash merger valued at approximately $1.5 billion. Under the merger terms, MONY shareholders were to receive $31 per share of MONY common stock and a dividend to be paid by AXA based on MONY's earnings in the second half of 2003. After a full review by the SEC, MONY issued its definitive proxy statement on January 8, 2004 and scheduled a shareholder vote for February 24, 2004. Under Delaware law, a merger agreement is binding only if a majority of all issued and outstanding company shares approve it. See 8 Del. C. § 251(c).

5
Reaction to the merger announcement was mixed; many shareholders argued that AXA's offer (representing 75 percent of MONY's book value) substantially undervalued the company and that the $90 million severance payments for MONY's management were excessive and suggestive of a conflict-of-interest. The MONY/AXA merger announcement also spawned numerous lawsuits;2 this appeal arises from MONY's action challenging Appellees' proxy solicitations.

6
In late January 2004, Appellees began considering a proxy solicitation to MONY shareholders that would be exempt under Rule 14a-2(b)(1) from the proxy regulations promulgated by the SEC. On January 22, 2004, Southeastern announced its intention to vote its MONY shares against the AXA merger, urged other MONY shareholders to do likewise, and indicated that Southeastern would further communicate its views "by means of an exempt solicitation under the federal proxy rules." By January 27, 2004, Highfields had begun exploring a similar shareholder communication and sought advice from SEC staff on any constraints imposed by the Exchange Act, particularly on whether an exempt solicitation under Rule 14a-2(b)(1) could "include a copy of MONY's proxy card in its mailing for the convenience of MONY shareholders to facilitate ... voting [against the merger]."

7
Highfields was advised by SEC staff that "although it [had] not been released formally, the Office of Mergers and Acquisitions at the SEC had considered and adopted a `nonpublished position'" in an informal April 1993 interpretation (circulated internally among SEC staff) that gave qualified approval to shareholders seeking to mail duplicates of management proxy cards as part of an exempt proxy solicitation under Rule 14a-2(b)(1). On the basis of these discussions with SEC staff, Highfields planned an exempt proxy solicitation to MONY shareholders that included duplicates of MONY's proxy card and conformed to the restrictions described in the April 1993 opinion.3

8
MONY commenced an action on February 3, 2004 in the United States District Court for the Southern District (Preska, J.) seeking a temporary restraining order and a preliminary injunction blocking Appellees from sending the duplicate proxy cards without first filing a proxy statement under Rule 14a-3(a). After a hearing on February 3, 2004, Judge Preska granted MONY's request for a restraining order, stating that "[t]he exemption set out in Rule 14a-2(b)(1)] does not apply here because [Appellees'] solicitation `furnishes or otherwise requests a form of revocation.'" Judge Preska also noted that a few votes changed by reason of the possibly invalid proxy solicitation would cause irreparable harm to MONY "[b]ecause of the requirement that 51% of [MONY] shareholders vote in favor of the proposal...."

9
Judge Preska ordered Appellees to show cause on February 6, 2004 as to why a preliminary injunction should not issue prohibiting Appellees from sending the duplicate cards. In the interim, Highfields and Longleaf sent solicitation letters to MONY shareholders (without the duplicate proxy cards) that detailed how shareholders could vote, change, or revoke their proxies.

10
The case was assigned to Judge Holwell, who extended the restraining order "for the reasons set forth in Judge Preska's initial order" until he had considered the arguments of all of the parties. Judge Holwell also invited the SEC to submit an amicus letter brief setting forth its position on

11
whether a party is entitled to the [Rule 14a-2(b)(1)] exemption if (1) the party sends shareholders a proxy solicitation that includes a proxy voting card which is an exact duplicate of a card previously sent to shareholders as part of a proxy solicitation by a non-exempt party who complied with the SEC's disclosure rules;

12
(2) the party solicits the shareholders to use the duplicate proxy card to vote against the proposal recommended by the company's Board of Directors and thereby to revoke any proxy previously given;

13
(3) this duplicate card is sent with instructions that, once marked, it be returned to the party (or agent thereof) who sent the original proxy card; and

14
(4) the duplicate card does not provide for any exercise of authority by the party who sent it, nor does it ever come back into the possession or under the control of the party who sent it.

15
By fax on February 10, 2004, Alan L. Beller, Director of the SEC's Division of Corporation Finance, and Giovanni P. Prezioso, General Counsel of the SEC, declined to take a formal position on behalf of the Commission: "In light of [the] short time frame, we have not had an opportunity to seek the view of the Commission with respect to the specific question raised by your letter." The letter-brief instead provided "background to Rule 14a-2(b)(1) and positions that the [SEC had] taken historically," noting that, in an informal April 1993 internal opinion, the SEC had considered whether

16
a person otherwise qualified to rely on [the exemptions of Rule 14a-2(b)(1) could] provide a solicited shareholder with a copy of management's proxy card for the purposes of facilitating the shareholder's revocation of a previous card or a vote in favor of a proposal supported by the soliciting party

17
The SEC's letter summarized this internal April 1993 opinion4 as follows:

18
• the provision of Rule 14a-2(b)(1) would not be violated since providing a copy of management's proxy card — which would be returned directly to management — does not create any proxy authority in the soliciting party; and

19
• although management's proxy card could have the effect of a revocation of an earlier dated proxy submitted by the same shareholder, this should not constitute a "form of revocation" envisioned by Rule 14a-2(b)(1)

20
(emphases added).

21
In an Opinion and Order entered February 11, 2004, Judge Holwell denied MONY's motion for a preliminary injunction on the ground that MONY was unlikely to succeed on the merits of its claim because, as a matter of law, a duplicate of the issuer's proxy card was not a "form of revocation" under Rule 14a-2(b)(1). The district court invoked policy considerations and cited the SEC's informal April 1993 opinion (as summarized in the SEC's letter brief).

22
As to irreparable harm, the court ruled that, although many of MONY's assertions were "for the most part too speculative and causally tenuous to support a preliminary injunction.... there is support for plaintiff's showing that a misinformed shareholder vote may result in irreparable harm." However, in light of its ruling that MONY was unlikely to succeed on the merits of its claim, the court dissolved the restraining order and denied MONY's motion for a preliminary injunction. In the alternative, the district court ruled that MONY had failed to show "serious questions going to the merits of its claim" and "a balance of hardships tipping decidedly in its favor."

23
On February 22, 2004, MONY's Board voted (i) to sweeten the terms of the merger agreement by issuing a special dividend of a dime a share to MONY shareholders of record at the closing of the merger, and (ii) to postpone the shareholder vote to May 18, 2004 (with a record date of April 8, 2004). MONY appealed the district court's denial of the preliminary injunction, claiming in its brief to this Court that it "has every reason to believe that, once the date nears and MONY has mailed its proxy voting card, [Appellees] will again seek to engage in solicitations of the type which led to the filing of this action." Nothing in Appellees' briefs to this Court disavows that intention; and at oral argument, Appellees made clear that, unless enjoined, they will (after the April 8, 2004 record date) distribute proxy solicitations that include the duplicate proxy cards.

24
The appeal of the district court's denial of a preliminary injunction was heard by this Court on April 1, 2004. The parties agree on appeal that (i) the mailings are "solicitations" and (ii) the solicitations do not seek proxy authority from MONY shareholders. The viability of the Rule 14a-2(b)(1) exemption therefore turns on one issue — whether the proxy card duplicate was a "form of revocation."5 See 17 C.F.R. § 240.14a-2(b)(1). After deliberations, we reversed from the bench and issued an order later that day directing the district court to grant MONY's motion for a preliminary injunction, and reciting that an opinion would follow.

Discussion

25
To secure a preliminary injunction in district court, the moving party must demonstrate "(1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." Forest City Daly Hous., Inc. v. Town of North Hempstead, 175 F.3d 144, 149 (2d Cir.1999). We evaluate MONY's request for a preliminary injunction under the "likelihood of success on the merits" prong because MONY does not appeal the district court's alternative holding that it failed to meet the more lenient standard of showing "sufficiently serious questions going to the merits of the case" and "a balance of hardships tipping decidedly in its favor."

26
It is settled that "a district court's decision to grant or deny a preliminary injunction is not generally reviewed de novo [but rather] for abuse of discretion." Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 171 (2d Cir.2001). At the same time,

27
[a] district court `abuses' or `exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions.

28
Id. at 169 (emphasis added).

29
* Rule 14a-2(b)(1) is part of a comprehensive proxy regulation scheme promulgated by the SEC pursuant to Section 14(a) of the Exchange Act. See 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-1, et seq.; see also 17 C.F.R. § 240.13d-1, et seq. Rule 14a-3(a) states (in relevant part) that

30
[n]o solicitation subject to this regulation shall be made unless each person solicited is ... furnished ... with a publicly-filed... written proxy statement containing the information specified in Schedule 14A ... or with a preliminary or definitive written proxy statement included in a registration statement filed under the Securities Act of 1933 on Form S-4 or F-4 ... or Form N-14 ... and containing the information specified in such Form.

31
17 C.F.R. § 240.14a-3(a). Appellees elected not to file proxy statements under Rule 14a-3(a).

32
In 1992, the SEC modified its proxy regulations to encourage "free discussion, debate and learning among shareholders." Regulation of Communications Among Shareholders, Exchange Act Release No. 31,326, 1992 SEC LEXIS 2470, at *19 (October 22, 1992) (the "1992 Amendments"). As modified by the 1992 Amendments, Rule 14a-2(b)(1) exempted from SEC proxy regulations

33
any solicitation by or on behalf of any person who does not, at any time during such solicitation, seek directly or indirectly, either on its own or another's behalf, the power to act as proxy for a security holder and does not furnish or otherwise request, or act on behalf of a person who furnishes or requests, a form of revocation, abstention, consent, or authorization ...

34
17 C.F.R. § 240.14a-2(b)(1) (emphases added). Thus, any communication that meets the Rule 14a-2(b)(1) exemption need not comply with, inter alia, the proxy statement disclosure requirement of Rule 14a-3(a).6 According to the SEC, this exemption sought to balance the policy goal of open shareholder communication with the "potential for abuse both by insurgents and by management" — especially in a proxy fight. 1992 Amendments at *27.

35
Until the events underlying this appeal, no federal court had addressed whether a proxy card duplicate is a "form of revocation" under Rule 14a-2(b)(1). We agree with Judge Holwell that "where a shareholder has previously submitted a proxy," transmission of a duplicate proxy card could legally have the "effect of a revocation," but that revocation "is not a necessary effect inherent in the card and does not transform management's proxy card into a form of revocation that places [Appellees] outside the ambit of the exemption." We further agree that, in some proxy voting situations, the submission of a subsequent proxy card may be something other or more than a "revocation" of a previous vote. For example, a shareholder might use a duplicate proxy card to "substitute" a new vote for one slate of director candidates in place of a prior vote for a slate.

36
We conclude, however, that the district court gave insufficient consideration to the particular circumstances of this case as affected by the mechanics of Delaware corporate law. Under Delaware law, any "merger or consolidation of domestic corporations" must meet a number of statutory requirements, including that, at a "special meeting for the purpose of acting on the [merger] agreement ... a majority of the outstanding stock of the corporation entitled to vote thereon shall be voted for the adoption of the agreement." 8 Del. C. § 251(c). Thus, in the context of a proxy vote to approve a merger agreement under Delaware law, a majority of all outstanding shares must vote "yes" in order to approve the merger; an abstention (or any vote other than "yes") is tantamount to a "no" vote. See id. Moreover, "when two proxies are offered bearing the same name, then the proxy that appears... to have been last executed will be accepted and counted under the theory that the latter — that is, more recent — proxy constitutes a revocation of the former." Standard Power & Light Corp. v. Investment Associates, Inc., 51 A.2d 572, 580 (Del.1947). The duplicate proxy cards would thus operate as a "revocation" only when returned by MONY shareholders who previously voted in support of the merger with AXA.

37
Appellees vigorously argue on appeal that duplicates of MONY's proxy card may be used by persons other than the MONY shareholders who have already voted and seek to revoke their votes. Most obviously, such duplicates are handy for shareholders who have lost or discarded their original proxy cards. Here, however, Appellees' own solicitations reflect that they intend the duplicate proxy card to be a "form of revocation" for MONY shareholders who have already voted. For example, the text of Highfields' first proposed proxy solicitation (in part) sought to inform MONY shareholders that "[w]hen properly signed and returned this proxy card shall revoke any proxy previously given in connection with the special meeting."

38
Revocation is the only likely use for such a duplicate proxy because: (i) undecided MONY shareholders presumably retain blank copies of their (original) management proxy cards, and (ii) other than the (presumably few) MONY shareholders who have lost or discarded the multiple proxy cards that have been sent to them by MONY and who cannot otherwise obtain new copies, the only MONY shareholders who truly "need" proxy card duplicates are those who have already sent their proxy cards and want to revoke their votes. There is no indication that the term "revocation" in Rule 14a-2(b)(1) has an unconventional legal meaning. See Standard Power & Light, 51 A.2d at 580 (a later proxy "constitutes a revocation" of an earlier one); Letter from Alan L. Beller, Dir., SEC Div. of Corp. Fin., and Giovanni P. Prezioso, SEC Gen. Counsel, 3 (Feb. 10, 2004) (conceding that a duplicate proxy card has "the effect of a revocation"). Absent such a special meaning of the term "revocation," the factual and legal circumstances of this case clearly suggest that Appellees' proxy duplicate would operate as a "form of revocation" when distributed in the context of a vote on a merger governed by Delaware law, and that it is intended as such by Appellees.

II

39
The 1992 Amendments emphasized that Rule 14a-2(b)(1) must be administered with an eye to the encouragement of a variety of policy goals. Highfields argues that paramount among these goals is preventing proxy voting from being a "one-sided discussion of the merits." 1992 Amendments at *23. Longleaf claims that another important goal of the Amendments is to encourage the "effective use of shareholder voting rights." 1992 Amendments at *8. According to Longleaf, reversal of the district court's ruling would contradict the goals of the 1992 Amendments because it would "make it more difficult and impractical for [such] shareholders to exercise their voting rights." Appellees also argue that subsequent informal opinions by SEC staff support the district court's view that allowing Appellees to distribute duplicate proxy cards would be "consistent with the policies underlying the adoption of the rule in 1992." In short, Appellees contend that the only way that dissident solicitors can communicate "effectively" with undecided shareholders is by sending a proxy solicitation that includes a duplicate proxy card.7

40
The SEC recognized that, if the 1992 Amendments (including Rule 14a-2(b)(1)) were construed too broadly, they could create the "potential for abuse both by insurgents and by management." 1992 Amendments at *27. The plain text of Rule 14a-2(b)(1) shows that the easy revocation of proxies was one such potential abuse. Moreover, in this case, participatory shareholder democracy is well-protected by Delaware law, which requires a majority of all MONY shareholders to approve the AXA merger for it to be binding. MONY management has every incentive to ensure that all company shareholders vote (and has sent multiple proxy cards to achieve that goal) — every proxy card that MONY shareholders lost, discarded, or simply did not bother to exercise is effectively a vote "against" the merger opposed by Appellees. Assuming Appellees are shrewd proxy tacticians, their only goal in sending out the duplicate proxy cards must be to encourage shareholders who have already voted for the merger to revoke their votes. The plain text of Rule 14a-2(b)(1) forbids the inclusion of such a "form of revocation" in an otherwise exempt solicitation.

41
We acknowledge that our conclusion on this issue could be viewed as contrary to the informal SEC opinion issued in April 1993.8 This Court has said that it

42
must defer to the SEC's interpretations of its own regulations in its amicus briefs unless they are plainly erroneous or inconsistent with the regulations [and that informal opinions such as] SEC no-action letters constitute neither agency rule-making nor adjudication and thus are entitled to no deference beyond whatever persuasive value they might have.

43
Gryl ex rel. Shire Pharms. Group PLC v. Shire Pharms. Group PLC, 298 F.3d 136, 145 (2d Cir.2002) (citations omitted). Here, the SEC's letter briefs to the district court (and this Court) expressly declined to offer formal support to its informal, unpublished April 1993 opinion. We therefore decline, for the reasons already stated in the context of this Delaware merger, to defer to the view expressed in the April 1993 opinion of the SEC.

44
As we first announced on April 1, 2004, we hold that MONY has demonstrated a likelihood that it will succeed on its claim that Appellees' use of duplicate proxy cards was outside the Rule 14a-2(b)(1) exemption and that, absent full compliance with SEC proxy regulations by Appellees, MONY will likely succeed in its claim against Appellees under Section 14(a).

III

45
In its Opinion and Order addressing whether MONY had shown it would suffer irreparable harm without a preliminary injunction, the district court conceded "there is support for [MONY's] showing that a misinformed shareholder vote may result in irreparable harm." The district court concluded, however, that "even this showing of irreparable injury is unavailing in light of [MONY's] failure to show a likelihood of success on the merits, and provides insufficient support for a preliminary injunction."

46
Rule 14a-3(a) requires that "[n]o solicitation subject to this regulation shall be made unless each person solicited is ... furnished ... with a publicly-filed ... written proxy statement..." 17 C.F.R. § 240.14a-3(a). Both Highfields and Longleaf have elected not to file such proxy statements under Rule 14a-3(a).

47
It is well-established that a transaction — particularly a change-of-control transaction — that is influenced by noncompliance with the disclosure provisions of the various federal securities laws can constitute irreparable harm.9 We decline to hold that a transaction influenced by noncompliance with the securities laws always results in irreparable harm because there are a number of circumstances that arguably could defeat such a broad rule, including those involving acts of bad faith, securities law infractions on both sides of a transaction, a situation where an injunction would suppress the only voice opposing a transaction, or other circumstances that we need not try to anticipate today.

48
In this case, we conclude that allowing Highfields and Longleaf to distribute duplicate proxy cards to MONY shareholders during a closely contested shareholder vote without complying with Rule 14a-3(a) would cause MONY irreparable harm. In passing Section 14(a), Congress sought to avoid a very particular harm — the solicitation of shareholder proxies without adequate disclosure. The SEC rules promulgated under Section 14(a) are intended to level somewhat the playing field for proxy contestants and to force disclosures that promote informed shareholder voting. In terms of MONY's interest as a proxy contestant, defeat of this transaction could spell the loss of a business opportunity that (by its nature) can only exist at one point in time and cannot be recovered or repaired with money damages.10 In terms of adequate disclosure, we observe that at least one of the Appellees, Highfields, has a "short" derivative position in bonds issued by AXA that has only recently been partially disclosed and that may or may not be in sync with the interests of other MONY shareholders.11

49
From either perspective, the possible harm is one that Congress has proscribed and that may easily transpire in a vote that (both sides concede) is likely to be close. The use of duplicate proxy cards to influence this vote therefore is inappropriate and amounts to the sort of irreparable harm that the securities laws and regulations were intended to prevent.

50
* * * * * *

51
For the foregoing reasons, we reverse the judgment of the district court, and, consistent with our April 1, 2004 Order, direct the district court to issue a preliminary injunction consistent with this opinion.

Notes:

*
The Honorable Frederic Block, Judge, United States District Court for the Eastern District of New York, sitting by designation

2
Several shareholder lawsuits against MONY, AXA, and MONY's board in Delaware Chancery Court were consolidated into one class action on November 4, 2003. On January 16, 2004, the class-action plaintiffs were granted leave to file a consolidated amended complaint. MONY, AXA, and MONY's board were also named in two class-action lawsuits (alleging similar claims) brought in New York State Supreme Court in Manhattan. Appellees have so far not joined these actions but have issued a number of public statements in various media denouncing the terms of the merger and urging its rejection by MONY shareholders

3
In its informal discussions with Highfields, SEC staff said that Appellees could send out a duplicate copy of MONY's proxy card with its solicitation so long as: (1) the sender's solicitation materials stated that the sender opposed the merger, and was asking the shareholder to oppose it; (2) the sender's solicitation materials stated that the proxy card was being furnished by the sender, not by MONY; (3) the sender's solicitation materials stated that the proxy card was being furnished by the sender for the convenience of the shareholder; (4) the sender provided the copy of the proxy card without seeking proxy authority from the shareholder; and (5) the proxy card was returned directly to MONY, not to the sender. A sixth apparent requirement was that the sender never have "possession or control of or access to the proxy card."

4
A second informal opinion from 2001 considered whether a duplicate proxy card where the vote had beenpre-marked was a "form of revocation," and is therefore factually distinguishable from this case.

5
On March 22, 2004, this Court invited SEC staff to submit to the Court its views on the issue of whether a proxy card duplicate constitutes a "form of revocation" under Rule 14a-2(b)(1). On March 25, 2004, SEC staff indicated in a faxed letter to this Court that it "does not wish to express any additional views beyond those set forth" in its February 10, 2004 letter-brief to the district court. Staff also informed this Court that "it has not been possible to seek the view of the Commission with respect to the interpretation of Rule 14a-2(b)(1) ..."

6
Rule 14a-2(b)(1) excludes several categories of persons and restricts its use in certain situations; none of those exclusions or restrictions apply to this appeal

7
However, MONYconcedes that, by itself, a letter giving shareholders detailed instructions on how to vote or how to revoke a vote is exempt under Rule 14a-2(b)(1). Brief for MONY at 30.

8
Although this informal April 1993 opinion was apparently never published by the SEC, it was summarized in the SEC staff's February 10, 2004 letter to the district court. It is not obvious that the facts of the April 1993 opinion involved a merger proposal where approval by a majority ofall outstanding shares was statutorily required.

9
See ICN Pharmaceuticals, Inc. v. Khan, 2 F.3d 484, 489 (2d Cir.1993) ("[A]n injunction will issue for a violation of § 13(d) only on a showing of irreparable harm to the interests which that section seeks to protect. Those interests are fully satisfied when the shareholders receive the information required to be filed.") (internal citations and quotation marks omitted); MAI Basic Four, Inc. v. Prime Computer, Inc., 871 F.2d 212, 218 (1st Cir.1989) (noting "the utility of injunctive relief to prevent violations of disclosure requirements... to the extent ... shareholders may be deprived of material information required to be disclosed" in change-of-control transactions); Polaroid Corp. v. Disney, 862 F.2d 987, 1006 (3d Cir.1988) ("The purpose of the Williams Act is to insure that public shareholders ... will not be required to respond without adequate information.... The theory of the Act is that shareholders are unable to protect their interests fully in making these decisions if the tender offeror fails to provide all material information regarding the offer. Irreparable harm arises because of the difficulty of proving money damages in a suit based upon material misrepresentations by the tender offeror. While Congress has determined that accurate disclosure is important to shareholders, it would often be impossible for shareholders to prove that on the facts of their particular tender offer accurate disclosure would have affected their decision making in a particular way with concomitant quantifiable monetary loss. The inadequacy of a remedy at law and the importance that Congress has attached to accurate disclosure of material information establishes irreparable harm.") (internal citations and quotation marks omitted); Marshall Field & Co. v. Icahn, 537 F.Supp. 413, 416 (S.D.N.Y.1982) (concluding that "irreparable harm" exists in a change-of-control transaction if shareholders are denied "important and legally required information as to [a group's] intentions which may affect their judgment as to whether the stock should be sold, bought, or held").

10
It may be true, of course, that the interests of MONY's management have been served as well (or better) through the injunction of the proxy solicitations containing duplicate proxy cards. If so, that is merely an irony that stems from the initial tactical decision of Highfields and Longleaf not to make disclosures under the proxy regulations

11
In the cases mentioned in Note 9, the refusals to comply with the securities rules were intended to helpadvance disputed transactions. Here, the refusal to comply with the securities rules arguably was intended to help block a disputed transaction. In light of the clear congressional intent of Section 14(a), we see no practical distinction between the harms inherent in these two situations.